**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SIENTRA, INC., *et al.*,[1] | ) Case No. 24-10245 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF VLADIMIR MOSHINSKY OF**
**MILLER BUCKFIRE IN SUPPORT OF:**

**(A) MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION FIRST LIEN SECURED PARTIES; (V) MODIFYING THE AUTOMATIC STAY; (VI) SCHEDULING FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**
**AND**
**(B) MOTION FOR (I) AN ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) APPROVING CERTAIN BID PROTECTIONS IN CONNECTION WITH THE DEBTORS' ENTRY INTO ANY POTENTIAL STALKING HORSE AGREEMENT; (D) SCHEDULING THE AUCTION AND SALE HEARING; (E) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

I, Vladimir Moshinsky, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Sientra, Inc. (1000); Mist Holdings, Inc. (4221); Mist, Inc. (1202); and Mist International, Inc. (3363). The Debtors' service address is 3333 Michelson Drive, Suite 650, Irvine, CA 92612.

4891-2811-6387.4 79023.00001

1.      I am a Managing Director of the investment banking firm, Stifel, Nicolaus & Co., Inc., the primary investment banking and broker-dealer subsidiary of Stifel Financial Corp. ("SF", NYSE: SF), which uses the trade name "Miller Buckfire" for its restructuring-focused investment banking practice, including my practice.  For clarity, each reference to "Miller Buckfire" in this Declaration is to the legal entity Stifel, Nicolaus & Co., Inc.  Miller Buckfire's principal investment banking office is at 787 Seventh Avenue, New York, NY 10019.  Miller Buckfire is the proposed investment banker to the above-captioned debtors and debtors in possession (the "Debtors").

2.      I submit this Declaration in support of the following:

(A)     *Motion of Debtors for Entry of Interim and Final DIP Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing the Use of Cash Collateral; (IV) Granting Adequate Protection to Prepetition First Lien Secured Parties; (V) Modifying the Automatic Stay; (VI) Scheduling Final Hearing; and (VII) Granting Related Relief* (the "DIP Motion") and the financing facility proposed therein (the "DIP Facility"); and

(B)     *Motion for (I) An Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving Certain Bid Protections in Connection with the Debtors' Entry Into Any Potential Stalking Horse Agreement; (C) Scheduling the Auction and Sale Hearing; (D) Approving the Form and Manner of Notice Thereof; and (E) Granting Related Relief; and (II) An Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases* (the "Bid Procedures Motion").[2]

3.      Except as otherwise indicated, all statements set forth in this Declaration are based upon (a) my personal knowledge of Debtors' operations and finances gleaned during the course of Miller Buckfire's engagement by the Debtors, (b) my discussions with the Debtors' senior management, other members of the Miller Buckfire team and the Debtors' other advisors, and (c) my review of relevant documents and/or my opinion based upon my experience.  If I were called upon

---

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the DIP Motion or the Bid Procedures Motion, as applicable.

to testify, I could and would testify competently to the facts set forth herein based on such personal knowledge, discussions, review of documents and/or opinions.

## BACKGROUND AND QUALIFICATIONS

4. Miller Buckfire's professionals have extensive experience in providing financial advisory and investment banking services to financially distressed companies and to creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in- and out-of-court. For the avoidance of doubt, later references to "Stifel" in this Declaration refer to the healthcare medical technology-focused industry investment banking services, whereas references to "Miller Buckfire" refer to restructuring-focused investment banking services.

5. Miller Buckfire and Stifel are affiliated broker-dealers. Generally, Miller Buckfire bankers are restructuring specialists and Stifel bankers are industry-specific and other specialists. In this case, the Stifel professionals involved have significant expertise in the healthcare medical technology industry in addition to a long term working relationship with the Debtors.

6. Miller Buckfire has been retained by debtors in numerous bankruptcy cases and jurisdictions around the country, including: Aéropostale, Inc.; Agera Energy LLC; Gymboree Group, Inc.; Invacare Corporation; Optima Specialty Steel, Inc.; PhaseBio Pharmaceuticals, Inc.; Structurlam Mass Timber U.S., Inc.; Tricida, Inc.; Sundance Energy Inc.; Rand Logistics, Inc.; Taylor-Wharton International LLC; Techniplas, LLC; Things Remembered, Inc.; TNT Crane & Rigging, Inc.; and Tuesday Morning Corporation.

7. I have eleven years of investment banking experience and, in my extensive experience, my work has focused on advising debtors, creditors, and equity holders in a wide range of recapitalization and restructuring transactions, including procuring, structuring, and negotiating postpetition financing facilities and asset sale transactions across a broad range of industries.

8.  Prior to joining Miller Buckfire (which at the time was a SF-owned affiliate of Stifel, Nicolaus & Co., Inc.) full-time in 2013, I worked as a Senior Consultant in the Financial Valuation Group of American Appraisal Associates, a division of Kroll. I hold an M.B.A. with high distinction from the Ross School of Business at the University of Michigan and a B.S. in Finance, with honors, from Rutgers Business School in New Brunswick, New Jersey.

## DIP AND SALE MARKETING EFFORTS AND FINANCING NEED

9.  In connection with evaluating its strategic alternatives, in late 2022, Sientra, Inc. ("Sientra") directed one of its then investment bankers, Stifel, to solicit market interest regarding a potential sale of the Debtors (the "Initial Sale Process"). Stifel has served as one of Sientra's investment bankers for approximately ten years, having accumulated significant knowledge of Sientra, its prospects and addressable market by executing numerous financial and strategic transactions in support of advancing the underlying business.

10. In connection with the Initial Sale Process, over a period of approximately five months, Stifel contacted twenty-three parties consisting of fourteen strategic and nine financial parties. These parties were identified and prioritized given their prior investment activity and demonstrated interest in medical aesthetics, breast reconstruction or adjacent areas. During the Initial Sale Process, potential acquirers were provided marketing materials and given access to non-public information and management as appropriate. Feedback from the Initial Sale Process included preliminary indications of value that were less than the Debtors' first lien obligations; as a result, the Debtors decided not to pursue a transaction at that time and continued to focus on executing their business plan and preserving liquidity.

11. In May 2023, due to the Debtors' financial position at the time, Sientra amended our engagement letter to include restructuring services.

12. During the summer of 2023, a strategic party expressed strong interest in acquiring Sientra and the Debtors authorized Miller Buckfire to continue to advance discussions and due diligence. By the end of July 2023, however, the Debtors determined that a viable transaction was not possible at the time. In the meantime, the Debtors' available liquidity and ability to maintain covenant compliance deteriorated and the Debtors asked Miller Buckfire to assist in seeking a financing transaction to address near-term needs and potentially refinance the existing secured debt.

13. Given the Debtors' existing indebtedness and limited access to equity capital markets, Miller Buckfire focused on lenders who had previously considered an investment in Sientra, were experienced in the medical technology sector or were familiar with special-situation financings. Miller Buckfire launched the financing process at the beginning of September 2023 and contacted a total of twenty parties. Ten parties executed a non-disclosure agreement ("NDA") and were given access to confidential marketing materials and offered access to a virtual data room. Ultimately, twelve parties provided specific feedback following their assessment of the opportunity which included a reluctance to finance the Debtors given a number of factors and no parties submitted proposed terms.

14. In late 2023, the Debtors decided to re-engage with three interested parties (the "Initial Bidders") from the Initial Sale Process and seek to advance discussions toward formal proposals.

15. In November 2023, Miller Buckfire, at the direction of the Debtors, requested that the Initial Bidders submit non-binding indications of interest ("IOIs"), which they did. The IOIs received provided for cash and non-cash consideration for substantially all of the Debtors' assets, but the total consideration was less than the amount of the existing secured debt. As a result, any transaction based on the IOIs would require the support and/or consent of the Prepetition First Lien Lenders.

16. During December 2023, the Prepetition First Lien Lenders engaged with the Debtors and undertook substantial due diligence efforts to evaluate the situation and the IOI submissions. In addition, the Initial Bidders continued their diligence efforts, which included traveling to Sientra's headquarters in Irvine, CA and its manufacturing facilities in Franklin, WI, in order to finalize their bids. At the same time, the Debtors' liquidity situation deteriorated further.

17. On January 17, 2024, the Initial Bidders were advised to provide best and final proposals and whether they would be willing to serve as a stalking horse bidder as part of a chapter 11 sale of the Debtors. The following week, the Initial Bidders provided feedback and/or best and final proposals. The Initial Bidders all expressed a strong desire to continue to pursue an acquisition of Sientra as part of a chapter 11 auction process, but were not willing to serve as a stalking horse or the structure of their bid and proposed terms were not acceptable to serve as a stalking horse bidder.

18. The Debtors, together with their advisors, have considered the proposed timeline for the sale process and confirmed support from the Initial Bidders regarding their ability to meet the proposed milestones. Since then, the Initial Bidders have all continued with their diligence efforts in contemplation of a chapter 11 filing, approval of bid procedures and scheduling an auction. In addition, in anticipation of the chapter 11 filing and postpetition sale process, on February 2, 2024, Miller Buckfire commenced a re-marketing of the opportunity to all parties from the Initial Process as well as additional parties identified by Miller Buckfire and/or the Debtors.

19. Leading up to the Petition Date, the Debtors' advisors engaged in vigorous, arms-length negotiations with the Prepetition First Lien Lenders regarding the proposed terms of a DIP facility and were able to successfully obtain a much needed larger funding amount (interim and final) than originally proposed, reduction in interest and fees and extension of sale process milestones.

20. To verify that no better third-party DIP financing was available to the Debtors, the Debtors directed Miller Buckfire to launch a DIP financing process. Commencing on February 1, 2024, Miller Buckfire contacted fifteen parties, including parties who had previously considered financing the Debtors, third party DIP lenders and the Initial Bidders. The parties were provided preliminary materials regarding the opportunity and offered an NDA to access non-public information. Thirteen parties executed or were already under an NDA, but no parties submitted a DIP proposal.

21. Based on my knowledge, the proposed DIP facility and the authorization to use Cash Collateral as offered by the DIP Secured Parties and the Prepetition First Lien Secured Parties are the best financing option that the Debtors could obtain under the circumstances. Fully unsecured postpetition financing was not available to the Debtors. Other potential sources of debtor in possession financing for the Debtors, including on a junior secured basis, were also nonexistent. As noted above, however, the Debtors were able to obtain (i) financing from the DIP Secured Parties on the terms of the proposed DIP Facility and (ii) the consent of the Prepetition First Lien Secured Parties to use Cash Collateral, all on the terms set forth in the DIP Motion.

22. I believe that it is essential to the success of the Debtors' Chapter 11 Cases, and the culmination of their sale process, that the Debtors receive immediate authority and access to use the Cash Collateral as well as the postpetition financing under the DIP Facility. Access to the Debtors' Cash Collateral alone will be insufficient to meet the Debtors' postpetition liquidity needs. The funds to be made available under the DIP Facility provide a lifeline to the Debtors and are crucial to avoid immediate and irreparable harm to the Debtors' estates. Without access to certain Cash Collateral in the form of proceeds from the sale of their products, the Debtors will lack the liquidity to support the Debtors' business operations while conducting the contemplated marketing process for the sale of

their assets. As a result, the Debtors require access to both their Cash Collateral and financing under the DIP Facility to fund these Chapter 11 Cases.

23. Failure to obtain the relief would eliminate the Debtors' ability to continue operating in the ordinary course and fund the cost of administering the Debtors' estates. Absent the relief requested in the Motion, the Debtors will have no choice but to stop operating, with abrupt and damaging consequences for the Debtors, their estates, and their stakeholders. Moreover, the requested relief is intended to preserve the value of the Debtors' business by providing the Debtors with the liquidity needed to support their operations during the pendency of these Chapter 11 Cases. The Debtors' key focus over the next several weeks will be reaching agreement with a potential purchaser for a going concern sale of substantially all of their assets to maximize the value for all stakeholders.

24. Based on my experience and involvement in the negotiation of the DIP Facility, I believe that the DIP Facility, together with the use of Cash Collateral, is the best available option for the Debtors, is in the best interest of the Debtors' estates and stakeholders, and is necessary and appropriate under the circumstances. As such, in my opinion, the DIP Facility should be approved and the Debtors should be authorized to use Cash Collateral on the terms proposed.

[*Remainder of page intentionally left blank*]

25. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: February 12, 2024

                                          */s/ Vladimir Moshinsky*
                                          Vladimir Moshinsky

                                          Managing Director
                                          Miller Buckfire