**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SIENTRA, INC., *et al.*,[1] | ) | Case No. 24-10245 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION FOR (I) AN ORDER (A) APPROVING BID PROCEDURES FOR THE SALE
OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING
PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; (C) APPROVING CERTAIN BID
PROTECTIONS IN CONNECTION WITH THE DEBTORS' ENTRY INTO ANY
POTENTIAL STALKING HORSE AGREEMENT; (D) SCHEDULING THE AUCTION
AND SALE HEARING; (E) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF; AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A)
APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL
ENCUMBRANCES AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT
OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

The above-captioned debtors and debtors-in-possession (the "Debtors") file this motion

(the "Motion") for entry of an order, pursuant to sections 105(a), 363, 365, 503, 507, 1107, and

1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and

6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the District of Delaware (the "Local Rules"), substantially in the proposed form attached

hereto as **Exhibit A** (the "Bid Procedures Order"):

    i.       establishing bid procedures (the "Bid Procedures"), substantially in the form
attached as Exhibit 1 to the Bid Procedures Order, in connection with the sale or
sales (the "Sale") of substantially all of the Debtors' assets (the "Assets") pursuant
to section 363 of the Bankruptcy Code;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number are: Sientra, Inc. (1000); Mist Holdings, Inc. (4221); Mist, Inc. (1202); and Mist International, Inc.
(3363). The Debtors' service address is 3333 Michelson Drive, Suite 650, Irvine, CA 92612.

ii.    authorizing, but not directing, the Debtors, in consultation with the Consultation Parties[2] and with the consent of the Consenting Parties[3] (such consent not to be unreasonably withheld, conditioned or delayed),  to enter into a stalking horse agreement (the "Stalking Horse Agreement") with one or more parties (the "Stalking Horse Bidder") for a sale of the Assets (the "Stalking Horse Bid");

iii.   authorizing the Debtors, in consultation with the Consultation Parties and with the consent of the Consenting Parties (such consent not to be unreasonably withheld, conditioned or delayed), to offer a break-up fee of up to 3.0% of the total cash consideration offered for the Stalking Horse Bid (each, a "Break-Up Fee") and an expense reimbursement of up to $500,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections") for the Stalking Horse Bidder, if any;

iv.   scheduling an auction for the Assets (the "Auction") and approving the form and manner of notice thereof (the "Bid Procedures/Auction Notice");

v.    establishing certain procedures relating to the assumption and assignment of executory contracts and unexpired leases in connection with any Sale, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"), and approving the form and manner of notice of the proposed assumption and assignment of executory contracts and unexpired leases (the "Cure Notice"); and

vi.   setting a hearing for approval of the sale of Assets (the "Sale Hearing").

In support of this Motion, the Debtors rely upon and refer this Court to the *Declaration of Ron Menezes in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") and the *Declaration of Vladimir Moshinsky of Miller Buckfire*, incorporated herein by reference.[4]  In further support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    By this Motion, the Debtors seek to consummate one or more transactions (each, a "Sale Transaction") for the sale of the Assets under section 363 and, as applicable, section 365, of

---

[2]   The "Consultation Parties" are, collectively, the DIP Secured Parties, the Prepetition Secured Parties, and the Official Committee of Unsecured Creditors (the "Committee") (if any) appointed in these Chapter 11 Cases.  The DIP Secured Parties are the agent and lenders for the Debtors' postpetition and prepetition secured financing facilities, respectively.

[3]   The "Consenting Parties" are, collectively, the DIP Secured Parties and the Prepetition Secured Parties.

[4]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the First Day Declaration.

the Bankruptcy Code to the extent certain criteria are satisfied as set forth in greater detail below. The Assets generally consist of the Debtors' operating business as a manufacturer and supplier of medical aesthetics products, including primarily products used in breast reconstruction and augmentation procedures. The Bid Procedures contemplate an open process that protects the best interests of the Debtors' estates and creditors and preserves the Debtors' ability to exercise their fiduciary duties throughout the Sale process (the "Sale Process").

2.      With the assistance of their investment banker, Miller Buckfire & Co., LLC ("Miller Buckfire"), and in consultation with the Consultation Parties, the Debtors intend to engage in a robust marketing process to assist with the identification of one or more parties interested in pursuing a Sale (each, a "Potential Bidder") for substantially all or a portion of the Assets.

3.      The Bid Procedures provide the formal framework for the Sale and have been structured to elicit value-maximizing bids for the Assets, while also taking into account the extensive marketing efforts conducted by the Debtors and their advisors prepetition. Among other things, the Bid Procedures: (a) set forth the timeline for the Sale Process that is reasonable and appropriate to produce value-maximizing bids for the Assets and are consistent with applicable milestones; (b) establish the basic rules for submitting bids for the purchase of any or all of the Assets; (c) provide parameters for the selection of one or more Stalking Horse Bidders; and (d) provide major creditor groups with consultation rights at various stages in the process. The proposed Bid Procedures comply with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and, therefore, should be approved.

4.    Consistent with the Debtors' need to consummate the Sale as efficiently as possible, the Debtors propose the following key dates and deadlines for the Sale Process:[5]

| Date and Time[6] | Event or Deadline[7] |
|---|---|
| **Within one business day following entry of Bid Procedures Order** | Deadline to File Bid Procedures Notice |
| **March 8, 2024** | Deadline to (i) Designate Stalking Horse Bidder and (ii) Execute Stalking Horse Agreement |
| **March 13, 2024 at 5:00 p.m.** | Deadline to File and Serve Stalking Horse Objections |
| **March 18, 2024 at 5:00 p.m.** | Deadline to Submit Qualified Bids |
| **March 27, 2024** | Deadline to Designate Qualified Bids and File Auction Notice |
| **March 28, 2024 at 10:00 a.m.** | Sale Auction (if necessary) |
| **Within one business day after conclusion of Auction** | Deadline to File Notice of Successful Bidder and Back-Up Bidder |
| **March 29, 2024 at 5:00 p.m.** | Deadline to Object to Sale / Contract Assignment |
| **April 5, 2024 at a time to be determined** | Sale Hearing or as soon thereafter as the Court's calendar permits |
| **April 12, 2024** | Deadline to Close Sale Transaction |

5.    Accordingly, as discussed in detail herein, the Debtors respectfully request entry of the Bid Procedures Order.

**<u>JURISDICTION AND VENUE</u>**

6.    The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") under 28 U.S.C. § 157 pursuant to the Amended Standing Order of Reference from the United States District Court for the District of Delaware,

---

[5]    The Debtors, consistent with their fiduciary duties, in the exercise of their business judgment, and in consultation with the Consultation Parties, reserve the right to modify these dates consistent with the terms of the Bid Procedures.

[6]    All times are prevailing Eastern time. The Debtors, after consultation with the Consultation Parties, may extend the deadlines set forth herein.

[7]    All dates and deadlines are subject to Bankruptcy Rule 9006.

dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 507, 1107, and 1108 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, and 9014, and Local Rules 2002-1(b), 6004-1, and 9006-1.

## BACKGROUND

### A.      General Background

9.      On February 12, 2024 (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court.  The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date of this Motion, no official committee, trustee or examiner has been appointed in these chapter 11 cases (the "Chapter 11 Cases").

### B.      The Debtors' Assets

10.     Headquartered in Irvine, California, Sientra, Inc. ("Sientra") is a medical aesthetics company focused on empowering people to change their lives through increased self-confidence and self-respect.  Backed by unrivaled clinical and safety data, Sientra's platform of products

includes a comprehensive portfolio of round and shaped breast implants, the first fifth-generation breast implants approved by the FDA for sale in the United States; the industry's most complete tissue expander portfolio including the ground-breaking AlloX2 breast tissue expander (with patented dual-port and integral drain technology); the next-generation AlloX2Pro™, the first FDA-cleared MRI-compatible tissue expander, the DermaSpan™ single port tissue expander, and the Softspan™ range of extremity expanders; the Viality™ with AuraClens™ enhanced viability fat transfer system; the SimpliDerm® Human Acellular Dermal Matrix; and BIOCORNEUM, the preferred scar gel of plastic surgeons.  As of the Petition Date, the Debtors employ approximately 253 full-time employees.

11.     Sientra relies on a combination of trademarks, trade secrets, confidential information, copyrights, patent rights and other intellectual property rights to protect its intellectual property.  Sientra's trademark portfolio consists of 47 worldwide registered trademarks and 26 pending trademark applications; and the patent portfolio consists of two granted U.S. patents and nine pending U.S. and international patent applications, as well as several in-licensed patent rights.

12.     A detailed description of the Debtors' business and facts precipitating the filing of the Chapter 11 Cases are set forth in the First Day Declaration.

### C.    The Marketing Process

13.     In connection with evaluating its strategic alternatives, in late 2022, Sientra, Inc. ("Sientra") directed one of its then investment bankers, Stifel, to solicit market interest regarding a potential sale of the Debtors (the "Initial Sale Process"). Stifel has served as one of Sientra's investment bankers for approximately ten years, having accumulated significant knowledge of Sientra, its prospects and addressable market by executing numerous financial and strategic transactions in support of advancing the underlying business.

14.    In connection with the Initial Sale Process, over a period of approximately five months, Stifel contacted twenty-three parties consisting of fourteen strategic and nine financial parties.  These parties were identified and prioritized given their prior investment activity and demonstrated interest in medical aesthetics, breast reconstruction or adjacent areas.  During the Initial Sale Process, potential acquirers were provided marketing materials and given access to non-public information and management as appropriate.  Feedback from the Initial Sale Process included preliminary indications of value that were less than the Debtors' first lien obligations; as a result, the Debtors decided not to pursue a transaction at that time and continued to focus on executing their business plan and preserving liquidity.

15.    In May 2023, due to the Debtors' financial position at the time, Sientra amended Stifel's engagement letter to include restructuring services.

16.    During the summer of 2023, a strategic party expressed strong interest in acquiring Sientra and the Debtors authorized Miller Buckfire to continue to advance discussions and due diligence.  However, by the end of July 2023, the Debtors determined that a viable transaction was not possible at the time.  In the meantime, the Debtors' available liquidity and ability to maintain covenant compliance deteriorated and the Debtors asked Miller Buckfire to assist in seeking a financing transaction to address near-term needs and potentially refinance the existing secured debt.

17.    Given the Debtors' existing indebtedness and limited access to equity capital markets, Miller Buckfire focused on lenders who had previously considered an investment in Sientra, were experienced in the medical technology sector or were familiar with special-situation financings.  Miller Buckfire launched the financing process at the beginning of September 2023 and contacted a total of twenty parties.  Ten parties executed a non-disclosure agreement ("NDA")

and were given access to confidential marketing materials and offered access to a virtual data room. Ultimately, twelve parties provided specific feedback following their assessment of the opportunity which included a reluctance to finance the Debtors given a number of factors and no parties submitted proposed terms.

18. In late 2023, the Debtors decided to re-engage with three interested parties (the "Initial Bidders") from the Initial Sale Process and seek to advance discussions toward formal proposals.

19. In November 2023, Miller Buckfire, at the direction of the Debtors, requested that the Initial Bidders submit non-binding indications of interest ("IOIs"), which they did. The IOIs received provided for cash and non-cash consideration for substantially all of the Debtors' assets, but the total consideration was less than the amount of the existing secured debt. As a result, any transaction based on the IOIs would require the support and/or consent of the Prepetition First Lien Lenders.

20. During December 2023, the Prepetition First Lien Lenders engaged with the Debtors and undertook substantial due diligence efforts to evaluate the situation and the IOI submissions. In addition, the Initial Bidders continued their diligence efforts, which included traveling to Sientra's headquarters in Irvine, CA and its manufacturing facilities in Franklin, WI, in order to finalize their bids. At the same time, the Debtors' liquidity situation deteriorated further.

21. On January 17, 2024, the Initial Bidders were advised to provide best and final proposals and whether they would be willing to serve as a stalking horse bidder as part of a chapter 11 sale of the Debtors. The following week, the Initial Bidders provided feedback and/or best and final proposals. The Initial Bidders all expressed a strong desire to continue to pursue an

acquisition of Sientra as part of a chapter 11 auction process, but were not willing to serve as a stalking horse or the structure of their bid and proposed terms were not acceptable to serve as a stalking horse bidder.

22.     The Debtors, together with their advisors, have considered the proposed timeline for the sale process and confirmed support from the Initial Bidders regarding their ability to meet the proposed milestones.  Since then, the Initial Bidders have all continued with their diligence efforts in contemplation of a chapter 11 filing, approval of bid procedures and scheduling an auction.  In addition, in anticipation of the chapter 11 filing and postpetition sale process, on February 2, 2024, Miller Buckfire commenced a re-marketing of the opportunity to all parties from the Initial Process as well as additional parties identified by Miller Buckfire and/or the Debtors.

## RELIEF REQUESTED

### A.     Bid Procedures Order

23.     By this Motion, the Debtors seek the entry of the Bid Procedures Order: (i) approving the Bid Procedures; (ii) approving various forms and the manner of notice thereof; (iii) establishing the Assumption and Assignment Procedures; (iv) authorizing the Debtors, in consultation with the Consultation Parties and with the consent of the Consenting Parties (such consent not to be unreasonably withheld, conditioned or delayed), to designate the Stalking Horse Bidder and to provide the Bid Protections in connection therewith; (v) approving the Bid Protections; and (iv) scheduling the Auction and a Sale Hearing.

24.     Additionally, by this Motion, the Debtors further request that, at the Sale Hearing, the Court enter an order approving the Sale of the Assets free and clear of all Encumbrances.[8]

---

[8]     As used herein, "Encumbrance" and "Encumbrances" include all of the following, in each case, to the extent against or with respect to the Debtors, or in, on, or against, or with respect to any of the Assets: liens (including as defined in section 101(37) of the Bankruptcy Code, and whether consensual, statutory, possessory, judicial, or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code) ("Claims"), debts (as defined in

B.     **Bid Procedures**

25.     To maximize the value of their Assets for the benefit of the Debtors' estates and creditors, the Debtors seek to implement a competitive bidding process to culminate in one or more Sales.  As described more fully in the Bid Procedures and the Bid Procedures Order, the Debtors seek approval to sell the Assets to one or more Qualified Bidders (as defined below) that make the highest or otherwise best offers for the Assets.  The Debtors request that competing bids for the Assets, including the submission of any Stalking Horse Bid, be governed by the Bid Procedures and Bid Procedures Order, which, among other things, collectively establish:

a.     the requirements that an Interested Party must satisfy to be entitled to participate in the bidding process and become a Potential Bidder [Bid Procedures at § I.A.2];

b.     the requirements for Potential Bidders to submit bids and the method and criteria by which such bids become Qualified Bids [Bid Procedures at §§ I.B.3, I.C];

c.     the process for the selection of Stalking Horse Bid(s), if any [Bid Procedures at § I.B.1];

d.     the deadline by which bids must be submitted [Bid Procedures at § I.C.1];

e.     the Assumption and Assignment Procedures for executory contracts and unexpired leases [Bid Procedures at § I.C.2]; and

f.     various other matters relating to the Sale Process generally, including the Auction, designation of Successful Bidder(s), and Sale Hearing [Bid Procedures at §§ I.D, I.E, I.G].

26.     In addition, the Debtors seek the authority, subject to the terms of the Bid Procedures Order and the Bid Procedures, to accept a Stalking Horse Bid from a Potential Bidder

---

section 101(12) of the Bankruptcy Code), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, or interests of any kind or nature whatsoever, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to, on, or subsequent to, the commencement of these Chapter 11 Cases, and in each case, whether imposed by agreement, understanding, law, equity, or otherwise.

and to enter into a Stalking Horse Agreement in the Debtors' business judgment, in consultation with the Consultation Parties and with the consent of the Consenting Parties (such consent not to be unreasonably withheld, conditioned or delayed). To facilitate a competitive, value-maximizing Sale(s), by this Motion, the Debtors request authority, in the exercise of their business judgment, in consultation with the Consultation Parties and with the consent of the Consenting Parties (such consent not to be unreasonably withheld, conditioned or delayed), to offer Bid Protections to the Stalking Horse Bidder in accordance with the terms of the Stalking Horse Agreement, in the form of (a) a Break-Up Fee of up to an aggregate of three percent (3%) of the cash portion of the purchase price of the Stalking Horse Bid and (b) Expense Reimbursement for the Stalking Horse Bidder in connection with its bid, up to a maximum amount of $500,000.

27.    To the extent the Debtors, in consultation with the Consultation Parties and with the consent of the Consenting Parties (such consent not to be unreasonably withheld, conditioned or delayed), designate a Stalking Horse Bidder(s), the Debtors shall, by **March 8, 2024**, file a notice of such determination with the Court (the "Stalking Horse Bidder Notice"). The Stalking Horse Bidder Notice, if filed, shall also include a copy of the Stalking Horse Bidder's Stalking Horse Agreement.

28.    After submission of all Qualified Bids, the Debtors, after consultation with the Consultation Parties and with the consent of the Consenting Parties (such consent not to be unreasonably withheld, delayed or conditioned), will select the highest or otherwise best Qualified Bid(s) for the Assets (any one or more such Qualified Bids, a "Baseline Bid"). In no event shall any Qualified Bidder, other than a Stalking Horse Bidder, be entitled to any Bid Protections.

29.     The Bid Procedures contain the following provisions, some of which are required to be highlighted pursuant to Local Rule 6004-1(c) and which are more fully described in the Bid Procedures and the Bid Procedures Order:[9]

(a)     **Provisions Governing Qualification of Bidders** [Bid Procedures § II.A.2].  To participate in the bidding process and receive due diligence information, including full access to the Data Room and additional non-public information regarding the Debtors (the "Diligence Materials"), parties interested in receiving due diligence information to participate in the bidding process (each, an "Interested Party") must deliver or have previously delivered to the Debtors, if determined to be necessary by the Debtors in their sole discretion, the following documents (collectively, the "Preliminary Bid Documents"): (a) an executed confidentiality agreement using the Debtors' form, as may be amended, on terms reasonably acceptable to the Debtors, to the extent not already executed (a "Confidentiality Agreement"); (b) a statement and/or other factual support demonstrating to the Debtors' and the Consenting Parties' satisfaction in the exercise of their reasonable business judgment that the Interested Party has a *bona fide* interest in purchasing all or any portion of the Assets; and (c) preliminary proof by the Interested Party of its financial capacity to close its proposed Sale Transaction, which may include oral or written representations of an Interested Party's financial wherewithal or financial statements of, or verified financial commitments obtained by, the Interested Party (or, if the Interested Party is an entity formed for the purpose of acquiring all or any portion of the Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors (including in consultation with their advisors and the Consenting Parties).

(b)     **Stalking Horse Bidder(s) and Bid Protections** [Bid Procedures § II.B.1].  The Debtors may, pursuant to these Bid Procedures, after consultation with the Consultation Parties and with the consent of the Consenting Parties (such consent not to be unreasonably withheld, conditioned or delayed) or with further order of the Court, (i) designate one or more Qualified Bidders that submit a Qualified Bid for all or any portion of the Assets as a stalking horse bidder (the "Stalking Horse Bidder"), whose Qualified Bid shall serve as the stalking horse bid ("Stalking Horse Bid"), and  (ii) execute, subject to higher or otherwise better offers, one or more purchase agreements memorializing the proposed transaction set forth in the Stalking Horse Bid (a "Stalking Horse Agreement"), which may include: (x) a break-up fee of no more than 3.0% of the total cash consideration payable under such Stalking Horse Agreement (the "Break-Up Fee") plus (y) an expense reimbursement for the Stalking Horse Bidder's actual out-of-pocket costs of up to $500,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections"); *provided, further*, that if the DIP Secured Parties and/or the

---

[9]     These provisions are excerpted from the Bid Procedures.  However, to the extent any inconsistencies between this summary and the Bid Procedures exist, the Bid Procedures shall govern.

Prepetition Secured Parties have provided a Credit Bid (as defined below) to be a Stalking Horse Bidder, they shall no longer be a Consultation Party to such Assets that are the subject of such Credit Bid so long as such Credit Bid has not been withdrawn; *provided, further,* that Bid Protections shall only be payable upon consummation of an alternative transaction and from the proceeds thereof. For the avoidance of doubt, to the extent the Debtors designate more than one Stalking Horse Bidder pursuant to these Bid Procedures, no two Stalking Horse Bidders will be designated with respect to any of the same Assets. The Debtors shall not pay a Break-Up Fee to any Stalking Horse Bidder on account of the portion of the Purchase Price of such Bid that is a Credit Bid, assumption of liabilities, or other non-cash (or cash-equivalent) consideration.

(c)   **Provisions Governing Qualified Bids** [Bid Procedures § II.C.2]

(i)   *Assets*. Each Interested Party, Potential Bidder, and Qualified Bidder (each, a "<u>Bidder</u>" and, collectively, the "<u>Bidders</u>") must state that the Bid includes an offer by the Bidder to effectuate a Sale Transaction and identify which Assets or portion of the Assets that are included in the Bid.

(ii)   *Good Faith Deposit*. Each Bid must be accompanied by a cash deposit (the "<u>Good Faith Deposit</u>") in the form of a wire transfer, certified check, or cash payable to the order of counsel pursuant to instructions to be provided by Debtors equal to 10% of the Bidder's proposed Purchase Price (as defined herein), which will be held in a non-interest bearing escrow or trust account; *provided* that a credit bid shall not require a Good Faith Deposit.

(iii)   *Purchase Price*. Each Bid must clearly set forth the cash purchase price (the "<u>Cash Consideration</u>") and identify any non-cash consideration included in such Bid (together with the Cash Consideration, the "<u>Purchase Price</u>") including, without limitation, which executory contracts and unexpired leases the Bidder expects the Debtors to assume and assign to the Bidder (the "<u>Transferred Contracts</u>") and which liabilities, if any, of the Debtors the Bidder is agreeing to assume (the "<u>Assumed Liabilities</u>"). The Purchase Price associated with each Bid may include only cash and/or other consideration acceptable to the Debtors after consultation with the Consultation Parties. If a Stalking Horse Bidder has been selected for all or any portion of the Assets, the cash component of any other Qualified Bid with respect to all or any portion of the Assets must be a Topping Bid with respect to the applicable Assets. For the Bid to qualify as a "<u>Topping Bid</u>," it must provide for consideration at Closing (as defined herein) that is equal to or in excess of the sum of: (i) the Stalking Horse Bid; (ii) the Expense Reimbursement; (iii) the Break-Up Fee; and (iv) the Minimum Increment (as defined herein).

(iv)   *Binding and Irrevocable*. Each Bid must include a signed writing stating that it is binding and irrevocable until the selection of the Successful Bidder, provided that if such Bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the closing of the

Sale with the Successful Bidder or, as applicable, the Back-Up Bidder (the "Closing").

(v)    *Contemplated Transaction Documents*.  Each Bid must include an executed Purchase Agreement marked against the Form APA pursuant to which the Qualified Bidder proposes to effectuate the contemplated Sale Transaction including: (i) a redlined copy of the Purchase Agreement marked to show all changes, which shall be limited to those that are reasonably necessary to effectuate the Bid, requested by the Qualified Bidder against the Form APA and (ii) any changes to any exhibits or schedules to the Purchase Agreement (collectively, the "Contemplated Transaction Documents").  The terms and conditions of the Contemplated Transaction Documents must be, in the aggregate, not materially more burdensome or adverse to the Debtors than the provisions contained in any Stalking Horse Agreement.  A Bid must identify with particularity each and every condition to Closing and all Transferred Contracts pursuant to the Contemplated Transaction Documents.  All Bids must provide that all Cure Amounts (as defined herein) will be paid by such Bidder.  ***The Contemplated Transaction Documents must include a commitment to close by no later than April 12, 2024***.  A Bid shall contain a detailed description of how the Potential Bidder intends to treat current employees of the Debtors.

(vi)    *Contingencies*.  A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or completion of due diligence.  A Bid must disclose any governmental approvals identified by the Potential Bidder other than as set forth in the Contemplated Transaction Documents that may impact the evaluation of such Bid.

(vii)    *No Collusion*.  Each Bid must include a representation that the Bidder has not engaged in any collusion with respect to its Bid submission and that the Bidder will not engage in any collusion with respect to any Bids, the Auction, or the Sale Process.

(viii)    *Authorization and Identity*.    Each Bid must include evidence of authorization and approval from such Potential Bidder's board of directors (or comparable governing body, or a statement as to why such approval is unnecessary) with respect to the submission, execution, delivery, and closing of the Contemplated Transaction Documents.  A Bid must also fully disclose the identity of the entity that is submitting the Bid, including the identity of the ultimate beneficial owners of the Bidder and the identity of any person or entity providing debt or equity financing for the Bid.

(ix)    *Committed Financing*.  Each Bid must include written evidence that demonstrates the Potential Bidder has the necessary financial ability to close the contemplated Sale Transaction and provide adequate assurance of future performance under all Transferred Contracts.  Such information may include, *inter alia*, the following:

a. the Potential Bidder's current financial statements (audited, if they exist);

b. contact names, telephone numbers, and e-mail addresses for verification of financing sources;

c. evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated Sale Transaction (including confirmation that the funding of such commitments is not subject to any contingency); and

d. any other form of financial disclosure of credit-quality support information acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated Sale Transaction.

(x) *Adequate Assurance of Future Performance*. Each Bid must demonstrate, in the Debtors' reasonable business judgment and after consultation with the Consultation Parties, that the potential Bidder can provide adequate assurance of future performance to the applicable counterparty under all Transferred Contracts as required by section 365 of the Bankruptcy Code.

(xi) *No Fees Payable to Qualified Bidder*. Other than any Stalking Horse Bidder, a Bidder may not request any break-up fee, termination fee, expense reimbursement, or any similar type of payment. Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code relating in any way to the submission of its Bid, compliance with the Bid Procedures, or participation in the Sale Process.

(xii) *Payment of Break-Up Fee and Expense Reimbursement*. If a Stalking Horse Bidder has been selected for all or any portion of the Assets that are the subject of a Bid, a Bid must allow for the payment of the Break-Up Fee and Expense Reimbursement to the Stalking Horse Bidder from the first proceeds of the cash portion of the Purchase Price of such Bid upon Closing to the extent the Bid overlaps with the Stalking Horse Bid in regard to the Assets included in such Bid. The applicable Bid Protections will only be earned by the Stalking Horse Bidder if the Successful Bidder has Overbid the Stalking Horse Bidder on the same Assets included in the applicable Stalking Horse Bid, and will only be payable at the Closing of the applicable Sale Transaction to the Successful Bidder from the proceeds of such Sale Transaction.

(xiii) *Non-Reliance*. A Bid must include an acknowledgement and representation of the Potential Bidder that it has had an opportunity to conduct any and all due diligence regarding the Assets (as applicable to its Bid) and Assumed Liabilities prior to making its Bid, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents

and/or the Assets in making its Bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or, as applicable, the physical condition of the Assets, the Assumed Liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Contemplated Transaction Documents.

(xiv) *As Is, Where Is.*  A Bid must include an acknowledgement and representation of the Potential Bidder that it understands that any Sale Transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or their estates except to the extent set forth in the Purchase Agreement of the Successful Bidder.

(xv) *Adherence to Bidding Procedures*.  By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

(d) **Right to Credit Bid** [Bid Procedures § II.B.4].  To the extent permitted under section 363(k) of the Bankruptcy Code, any party that has a valid and perfected lien on any of the Debtor's assets (a "<u>Secured Creditor</u>") may submit a credit bid for all or a portion of the Assets subject to such parties' liens, up to the amount of such parties' claims (a "<u>Credit Bid</u>").

Any Credit Bid made by a Secured Creditor will be deemed to be a cash bid solely for purposes of the Debtors' evaluation of bids (including the Debtors' evaluation of Qualified Bids and subsequent bids). Any Secured Creditor shall be deemed to be a Qualified Bidder, shall be deemed to have submitted a Qualified Bid, and may participate in any Auction with respect to any assets constituting collateral of such Secured Creditor without the requirement to submit a Good Faith Deposit (as defined herein) or any Contemplated Transaction Documents (as defined herein) other than a Form APA.  A Secured Creditor may Credit Bid at any time prior to the conclusion of the Auction, regardless of whether the Secured Creditor participated in prior rounds at the Auction.

To the extent that the DIP Secured Parties or the Prepetition Secured Parties submit a Credit Bid for all or any portion of the Assets, such parties' rights as Consultation Parties shall be terminated as of such time with respect to the Assets covered by such Credit Bid; *provided*, *however*, that any parties who submit a Credit Bid and later withdraw such bid shall resume being treated as Consultation Parties for purposes of these Bid Procedures.

(e) **Provisions Governing the Auction** [Bid Procedures § II.D].  After the receipt and review of all Qualified Bids, the Debtors shall make a determination, after consultation with the Consultation Parties and with the consent of the Consenting Parties (not to be unreasonably

withheld, conditioned or delayed), whether to accept the highest or best Qualified Bid(s) for all or any portion of the Assets.

To the extent the Debtors receive Qualified Bids and determine to proceed to Auction, the Debtors, after consultation with the Consultation Parties and with the consent of the Consenting Parties (not to be unreasonably withheld, conditioned or delayed), shall determine which Qualified Bid(s) represent the then highest or otherwise best Bid(s) for all or any subset of the Assets, as applicable (the "Baseline Bid(s)"). The determination of which Qualified Bid(s) constitute the Baseline Bid(s) and which Qualified Bid(s) constitute the Successful Bid(s) (as defined herein) shall take into account any factors the Debtors, after consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid(s) to their estates, including, *inter alia*: (a) the amount and nature of the consideration; (b) the certainty of closing; (c) the net economic effect of any changes to the value to be received by the Debtors' creditors from the proposed Sale Transaction(s); (d) the allocation of the Purchase Price between or among Assets; (e) tax consequences of such Qualified Bid(s); (f) whether the Qualified Bid contemplates a Sale Transaction that would be consummated through a Plan or a sale pursuant to section 363 of the Bankruptcy Code; and (g) any other quantitative or qualitative criteria available to assess such Bid (collectively, the "Bid Assessment Criteria"). If the Debtors, pursuant to these Bid Procedures, designate a Stalking Horse Bidder, the Baseline Bid(s), to the extent not the Stalking Horse Bid, must be a Topping Bid.

On or before ***March 27, 2024***, the Debtors shall file a notice on the Court's docket (an "Auction Notice") providing notice of the location of the Auction.

Unless otherwise designated by the Debtors, after consultation with the Consultation Parties, the Auction shall commence at ***10:00 a.m. (Eastern Time) on March 28, 2024***, at a location to be designated in the Auction Notice. In the Debtors' discretion, after consultation with the Consultation Parties, the Auction may be held by telephonic or video conference.

The Auction shall be conducted according to the following procedures:

(i)    *Participation at the Auction*. Unless the Debtors, after consultation with the Consultation Parties, determine otherwise, only the Stalking Horse Bidder and Qualified Bidders that have submitted Qualified Bids are eligible to participate at the Auction. The authorized representatives and professional advisors of each of the Qualified Bidders, the Stalking Horse Bidder, the Debtors, the Consultation Parties, and the United States Trustee for the District of Delaware shall be permitted to attend the Auction; *provided* that Qualified Bidders may appear through a duly authorized representative other than their counsel bearing a valid and enforceable power of attorney or other written proof evidencing their ability to bind the applicable Qualified Bidder, which document(s) shall be delivered to the Debtors prior to the commencement of the Auction.

Except as otherwise set forth herein, the Debtors, after consultation with the Consultation Parties, may conduct the Auction in the manner they determine will result in the highest or best offer(s) for the Assets in accordance with the Bid Procedures.

In the event, after the conclusion of the Auction, that certain discrete Assets which are not included in the Successful Bid(s) have not been sold (the "Unsold Assets"), the Debtors may, in the exercise of their business judgment and after consultation with the Consultation Parties, resume an auction for the sale of the Unsold Assets, on such bid procedures as may be implemented by the Debtors after consultation with the Consultation Parties.

(ii)     *The Debtors Shall Conduct the Auction*.    The Debtors and their professionals shall direct and preside over the Auction.  Bidding shall begin with the Baseline Bid(s).  At the start of the Auction, the Debtors shall describe the terms of any Baseline Bid(s).  All Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders.  Only Qualified Bidders may participate in or make subsequent Bids at the Auction.   The Debtors reserve the right to conduct the Auction, after consultation with the Consultation Parties, in the manner designed to maximize value based upon the nature and extent of the Qualified Bids received in accordance with the Bid Procedures, the Bid Procedures Order, the Bankruptcy Code, and any other order of the Court entered in connection herewith and disclosed to each Qualified Bidder.  The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid(s), all Overbids, and the Successful Bid(s).  Pursuant to Local Rule 6004-1, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the Sale Process, the Bid Procedures, the Auction, or the proposed Sale Transaction(s).

At the commencement of the Auction, the Debtors may announce modified or additional procedures for conducting the Auction and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive Bid(s) or otherwise modify the Bidding Procedures, in each case in consultation with the Consulting Parties.

(iii)    *Terms of Overbids*.  An "Overbid" is any Bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the applicable Baseline Bid(s) that satisfies the following conditions:

a.      Minimum Increment.  During the Auction, bidding shall begin with the Baseline Bid.  Due to the potential combinations of Assets that may be included in any Bid, the Debtors reserve all rights with respect to the comparison of Qualified Bids to Stalking Horse Bids and the

determination of the Baseline Bid(s) subject to the rights of the Consultation Parties and Consenting Parties as provided for herein. The initial Overbid after the Baseline Bid (the "Initial Overbid") and any Bids thereafter shall be made in increments of at least $250,000 or as otherwise announced on the record, after consultation with the Consultation Parties, prior to the start of the Auction or during the Auction (the "Minimum Increment"), *plus* solely in the event the Baseline Bid is a Stalking Horse Bid, (ii) the Break-Up Fee *plus* (iii) the Expense Reimbursement, as applicable to the Assets included in the Bid, in cash or other consideration acceptable to the Debtors, after consultation with the Consultation Parties and with the consent of the Consenting Parties (not to be unreasonably withheld, conditioned or delayed). Any Overbids subsequent to the Initial Overbid shall be made in increments of at least the applicable Minimum Increment; *provided, however*, that any Overbids by the Stalking Horse Bidder shall only be required to be equal to the sum of (x) (1) the Baseline Bid or the then existing highest Bid *plus* (2) the Minimum Increment *less* (y) the sum of the amount of the Bid Protections applicable to the Assets included in the Bid.

Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtors, after consultation with the Consultation Parties and with the consent of the Consenting Parties (not to be unreasonably withheld, conditioned or delayed), accept a higher Qualified Bid as an Overbid.

b.   <u>Consideration of Overbids</u>. The Debtors, after consultation with the Consultation Parties and with the consent of the Consenting Parties (such consent not to be unreasonably withheld), reserve the right to make one or more adjournments in the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in the exercise of their business judgment and after consultation with the Consultation Parties, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Sale Transaction at the prevailing Overbid amount.

During the course of the Auction, the Debtors shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of such Overbid and inform each Qualified Bidder whether such Overbid reflects, in the Debtors' view, in consultation with the Consultation Parties and with the consent of the Consenting Parties (not to be unreasonably withheld, conditioned or delayed), the then highest or otherwise best bid(s) for the applicable Assets.

To remain eligible to participate in the Auction, in each round of bidding, each Qualified Bidder must submit an Overbid with respect to such round of bidding and to the extent a Qualified Bidder fails to submit an Overbid with respect to such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction; *provided* that the Debtors may waive such requirement in their business judgment in consultation with the Consultation Parties.

c.   <u>Closing Evidence</u>.  To the extent not previously provided on or before the Bid Deadline, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence reasonably acceptable to the Debtors, after consultation with the Consultation Parties, demonstrating such Qualified Bidder's ability to close the Sale Transaction proposed by such Overbid.

*(iv)*   *Additional Procedures*.   The Debtors, after consultation with the Consultation Parties and with the consent of the Consenting Parties (not to be unreasonably withheld, conditioned or delayed), may (a) determine which Qualified Bid is the highest or otherwise best offer, (b) reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale Transaction(s), or (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders, and (c) impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these chapter 11 cases.

*(v)*   *Consent to Jurisdiction as Condition to Bidding*.  All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Court and to have waived any right to a jury trial in connection with any disputes relating to the Sale Process, the Auction, the Bid Procedures, and the construction and enforcement of each Qualified Bidder's Contemplated Transaction Documents, as applicable.

*(vi)*   *Closing the Auction*.  The Auction shall continue until there is only one Qualified Bid for all or any of the Assets  (or multiple non-overlapping Qualified Bids for any subsets of the Assets if there is no single Qualified Bid for all the Assets) that the Debtors determine, in the exercise of their business judgment, after consultation with the Consultation Parties and with consent of the Consenting Parties (such consent not to be unreasonably withheld, delayed or conditioned), is the highest or otherwise best Qualified Bid(s) (such Qualified Bid(s), the "<u>Successful Bid(s)</u>", and such Qualified Bidder(s), the "<u>Successful Bidder(s)</u>"), and that further bidding is unlikely to result in a higher or otherwise better Qualified Bid, at which point, the Auction will be closed.  In selecting the Successful Bid, the Debtors, after consultation with the Consultation Parties, may consider all factors relevant to the sale of the Assets, including the Bid Assessment Criteria.

Upon the closing of the Auction, the Debtors, after consultation with the Consultation Parties and with consent of the Consenting Parties (such consent not to be unreasonably withheld, delayed or conditioned), shall identify the Successful Bidder(s) and the Successful Bid(s) and the Back-Up Bidder(s) and Back-Up Bid(s) as soon as reasonably practicable which highest or best offer will provide the greatest amount of net value to the Debtors, and advise the Qualified Bidders of such determination. Due to the potential combinations of Assets that may be included in any Bid, the Debtors reserve all rights with respect to the comparison of Qualified Bids and the determination of the Successful Bidder(s) and Back-Up Bidder(s) (as defined herein).

The Qualified Bidder with the second highest or otherwise best Bid at the Auction with respect to the Assets or the applicable portion thereof, as determined by the Debtors, after consultation with the Consultation Parties and with consent of the Consenting Parties (such consent not to be unreasonably withheld, delayed or conditioned), shall be required to serve as the back-up bidder (the "Back-Up Bidder(s)"). The identity of the Back-Up Bidder(s) and the amount and material terms of the final Bid of the Back-Up Bidder(s) (the "Back-Up Bid(s)") shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the Successful Bid(s). Any Back-Up Bidder shall keep its Back-Up Bid open and irrevocable until the Closing of the Sale Transaction with the Successful Bidder. The Good Faith Deposit of the Back-Up Bidder(s) shall be returned by the Debtors within five (5) business days after Closing.

Within one (1) business day after the close of the Auction, the Successful Bidder(s) shall supplement the Successful Bidder(s)' Good Faith Deposit(s) such that the Good Faith Deposit(s) shall be equal to an amount that is ten percent (10%) of the Purchase Price of the Successful Bid(s).

The Debtors shall not consider any Bids or Overbids submitted after the closing of the Auction and any and all such Bids and Overbids shall be deemed untimely.

As stated above, the Successful Bid(s) of the Successful Bidder(s) and the Back-Up Bid(s) of the Back-Up Bidder(s), respectively, must be irrevocable until Closing.

## C.    Assumption and Assignment Procedures

30.    The Debtors are seeking approval of the Assumption and Assignment Procedures for notifying counterparties to executory contracts and unexpired leases (the "Contract Counterparties") of, among other things, proposed Cure Amounts (as defined below) with respect

to those executory contracts and unexpired leases that the Debtors may assume and assign and/or transfer in connection with a Sale Transaction(s) to the Successful Bidder(s) (the "Potential Assumed/Assigned Contracts").

31.    Within **three (3) business days after entry of the Bid Procedures Order**, the Debtors will file a notice (the "Assumption and Assignment Notice") identifying the Potential Assumed/Assigned Contracts (such list, the "Cure Schedule"),[10] substantially in the form attached as Schedule A to Exhibit 3 to the Bid Procedures Order, and serve such notice on all Contract Counterparties to the Potential Assumed/Assigned Contracts.  The Assumption and Assignment Notice served on each Contract Counterparty shall: (i) identify Potential Assumed/Assigned Contracts; (ii) identify the Debtor counterparty to such Potential Assumed/Assigned Contracts; (iii) list the proposed cure amounts, if any, that the Debtors believe must be paid to cure all defaults outstanding under each Potential Assumed/Assigned Contract (the "Cure Amounts") as of such date; (iv) include a statement that assumption and assignment of such Potential Assumed/Assigned Contract is not required or guaranteed; and (v) inform such Contract Counterparty of the requirement to file any Cure/Assignment Objection (as defined below) by the Cure/Assignment Objection Deadline (as defined below).  Service of the Assumption and Assignment Notice, including the Cure Schedule, upon a Contract Counterparty does not constitute an admission that a particular Potential Assumed/Assigned Contract is an executory contract or unexpired lease, or confirm that the Debtors are required to assume and/or assign such contract or lease.[11]

---

[10]    For the avoidance of doubt, the Debtors reserve all rights to remove any executory contract or unexpired lease from the Potential Assumed/Assigned Contract and Cure Schedule prior to Closing of any Sale Transaction, in which instance such executory contract or unexpired lease will not be a Transferred Contract (as such term is defined below).

[11]    The Debtors reserve all rights concerning the characterization of the Potential Assumed/Assigned Contracts in all respects.

32.    The Debtors further request that a Contract Counterparty must file any objection to the Cure Amount and/or the assumption and assignment or transfer of such Potential Assumed/Assigned Contract by **March 29, 2024 at 5:00 p.m. (Eastern Time)** (the "Cure/Assignment Objection Deadline").

33.    In addition, if the Debtors, Successful Bidder(s), or Backup Bidder(s), as applicable, in accordance with the Bid Procedures, identify additional executory contracts or unexpired leases that it wishes to add to or remove from to the Potential Assumed/Assigned Contracts and Cure Schedule (each an "Additional Contract") the Debtors shall, as soon as practicable after making or being informed of such a determination, send a supplemental Assumption and Assignment Notice (a "Additional Assumption and Assignment Notice") to the applicable Contract Counterparties to such Additional Contracts.

34.    The Debtors request that the Court require that any objections to a proposed Cure Amount (a "Cure Objection") and/or any other objections to the assumption and assignment or transfer of any of the Potential Assumed/Assigned Contracts (an "Assignment Objection") must: (i) be made in writing and filed on the docket for these Chapter 11 Cases no later than the Cure/Assignment Objection Deadline; (ii) state the basis of such objection with specificity, including, without limitation, the Cure Amount alleged to be due by such Contract Counterparty, and include complete contact information for such Contract Counterparty (including address, telephone number, and email address); (iii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; and (iv) be served upon the Notice Parties (as defined in the Bid Procedures), so as to be actually received by such parties on or before the Cure/Assignment Objection Deadline.

35.     In addition, the Debtors request that objections from any Contract Counterparty to an Additional Assumption and Assignment Notice (an "Additional Potential Assignment/Cure Objection") must: (i) be made in writing and filed on the docket by the later of (a) the Cure/Assignment Objection Deadline and (b) seven (7) calendar days after the Debtors file and serve the Additional Assumption and Assignment Notice (as applicable, the "Additional Potential Assignment/Cure Objection Deadline"); (ii) state the basis of such objection with specificity, including, without limitation, any Cure Amount alleged by such Contract Counterparty, and include contact information for such Contract Counterparty; (iii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules; and (iv) be served upon the Notice Parties (as defined in the Bid Procedures) so as to be actually received on or before the Additional Potential Assignment Objection Deadline.

36.     The Assumption and Assignment Notice also provides that Cure/Assignment Objections, if any, will be heard at (i) the Sale Hearing or (ii) on such other date subsequent to the Sale Hearing as the Court may designate prior to, during, or after the Sale Hearing (the "Cure/Assignment Hearing").  Any Additional Assumption and Assignment Notice shall provide that Additional Potential Assignment/Cure Objections will be resolved at a hearing to be held by the Court (i) on or before seven (7) calendar days from the timely filing of the Additional Potential Assignment/Cure Objection; (ii) at the Cure/Assignment Hearing; or (iii) such other date designated by the Court.

37.     At the Sale Hearing, (i) the Successful Bidder(s) shall present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder(s) with respect to the Transferred Contracts and (ii) the Debtors will request entry of an order approving the assumption and assignment of any or all Potential Assumed/Assigned Contracts to be assumed by

the applicable Debtors and assigned to the Successful Bidder(s).  For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

**D.**     **Scheduling and Notice**

38.     The Debtors seek to (i) obtain entry of the Bid Procedures Order by no later than **fourteen (14) days after the Petition Date**, and (ii) obtain entry of an order approving the Sale and close the Sale by no later than **April 12, 2024**.

39.     Given the Debtors' robust prepetition marketing efforts and the proposed postpetition marketing and diligence period to be established by the Bid Procedures, the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for the Assets.

40.     **Notice of Motion**.  On the date the notice of this Motion is filed or as soon as is practicable thereafter, the Debtors will cause this Motion and all exhibits hereto, the Bid Procedures, and a copy of the proposed Bid Procedures Order, to be served upon (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the DIP Secured Parties and the Prepetition Secured Parties; (c) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis and counsel to any official committee appointed in these Chapter 11 Cases; (d) all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; (e) all parties reasonably known to the Debtors that assert liens, claims, and encumbrances, and other interests with respect to the Assets; (f) all entities known to have expressed an interest in bidding on the Assets; (g) all known counterparties to the Debtors' executory contracts and unexpired leases; and (h) the Internal Revenue Service, the Securities and Exchange Commission, and any other federal, state or local governmental agency to the extent

required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or order of the Court (collectively, the "Sale Notice Parties").

41.     **Notice of Bid Procedures**. Within one (1) business day after the entry of the Bid Procedures Order, or as soon thereafter as practicable, the Debtors shall cause to be served, by first-class mail, postage prepaid, a notice (the "Bid Procedures Notice") setting forth, among other things, the dates established for submission of Qualified Bids, the Auction, and the Sale Hearing, substantially in the form attached to the Bid Procedures Order as Exhibit 2, upon the Sale Notice Parties and all of the Debtors' known creditors.

42.     **Notice of Successful Bidder(s)**. Following the Auction, the Debtors will promptly file with the Court a notice (the "Notice of Successful Bidder") that will inform the Court of the results of the Auction.  The Notice of Successful Bidder will identify, among other things: (i) the Successful Bidder(s) as the proposed purchaser(s) of the Assets; (ii) the amount and form of consideration to be paid by the Successful Bidder(s) for the Assets; (iii) the liabilities to be assumed by the Successful Bidder(s); and (iv) the Potential Assumed/Assigned Contracts to be assumed by the Debtors and assigned to the Successful Bidder(s), or the Debtors' rights and interests therein sold and transferred to the Successful Bidder(s), as the case may be, in connection with the Sale Transaction(s) (the "Transferred Contracts").[12]  The Notice of Successful Bidder will also include similar information relating to the Back-Up Bidder(s) and the Back-Up Bid(s).  In addition, the Debtors will attach to the Notice of Successful Bidder: (i) the Sale Order(s) approving the Sale(s) to the Successful Bidder(s); (ii) a copy of the Purchase Agreement(s) entered into by the Debtors and the Successful Bidder(s) following the Auction; and (iii) any additional information or

---

[12]    For the avoidance of doubt, the identification of the Transferred Contracts in the Notice of Successful Bidder may be accomplished through the attachment of any relevant schedule(s) to the Purchase Agreement(s) attached to such notice.

documentation relevant to the Successful Bid(s).  The Debtors will file the Notice of Successful Bidder on the docket for these Chapter 11 Cases as promptly as is reasonably practicable prior to the Sale Hearing, but will not be required to serve the same on any parties-in-interest in these Chapter 11 Cases.

**E.**     **Sale Order**

43.     To ensure the Debtors are in compliance with the terms of the DIP Facility, the Debtors request that this Court set the Sale Hearing for a date that is not later than **April 5, 2024**. At the Sale Hearing, the Debtors intend to seek the entry of the Sale Order: (a) approving the Sale(s) free and clear of all Encumbrances, and (b) authorizing the assumption and assignment or transfer of the Transferred Contracts, among other things.[13]  Pursuant to the Sale Order, the Debtors will sell any Assets that are the subject of a Sale Transaction free and clear of all Encumbrances to the fullest extent possible pursuant to section 363(f) of the Bankruptcy Code (except for those Assumed Liabilities and obligations expressly assumed by the Successful Bidder(s)), and the Successful Bidder(s) will be protected from liability for and cannot be pursued for any claims owed by the Debtors, except as otherwise agreed by the Successful Bidder(s) and the Debtors or as set forth in the Sale Order.  In addition, the Sale Order will have findings that the Sale(s) is not a fraudulent conveyance.  The Bid Procedures provide proper and adequate notice for these and the other terms and conditions of the bidding, Auction, and Sale Processes.

---

[13]     To the extent the Debtors seek to consummate more than one Sale Transaction, the Debtors reserve the right to seek the entry of multiple Sale Orders in accordance with these procedures.

## BASIS FOR RELIEF REQUESTED

A.   **Approval of the Sale(s) Is Warranted Under Section 363(b) of
the Bankruptcy Code and the Bid Procedures Are Appropriate and
in the Best Interests of the Debtors' Estates and their Creditors**

44.   Section 363(b)(1) of the Bankruptcy Code provides that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . . "[14] Section 105(a) of the Bankruptcy Code further provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

45.   A debtor may be authorized to sell assets outside of the ordinary course of business pursuant to section 363 of the Bankruptcy Code if it demonstrates a sound business purpose for doing so.[15]

46.   Indeed, the paramount goal of a chapter 11 process is to maximize the proceeds received by the estate.[16] To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate of

---

[14]   11 U.S.C. § 363(b)(1).

[15]   *See In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del . 2003) (finding that a court should approve a debtor's use of assets outside ordinary course of business if debtor can demonstrate a sound business justification for proposed transaction); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 154 (Bankr. D. Del. 1999) (finding that the debtor's sound business purpose justified its sale of the assets outside of the ordinary course of business).

[16]   *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986) (noting the fairness and reasonableness of prices); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the ...debtor's duty...is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. v. Champion Intl Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *In re Summit Global Logistics, Inc.*, No. 08-11566, 2008 Bankr. LEXIS 896, at *43 (Bankr. D.N.J. Mar. 26, 2008) (describing a proposed transaction as one that "maximize[d] value and return to interested parties.").

a debtor and therefore are appropriate.[17]  With this in mind, courts have deferred to a debtor's business judgment in the context of bidding and auction procedures.[18]

47.     In exercising its fiduciary duties and in the sound exercise of their business judgment, the Debtors have determined that the Bid Procedures are the most appropriate method for encouraging competing bids that will maximize creditor recoveries and that will ensure the value received for their Assets is the highest or best the market can generate.

48.     The Bid Procedures provide a framework to facilitate and entertain bids for the purchase of any or all of the Debtors' Assets and, if such bids are received, to conduct an Auction in an orderly yet competitive fashion, thereby encouraging bids that maximize the value realized from a Sale of the Assets.  In particular, the Bid Procedures contemplate an open and fair auction process with minimum barriers to entry and provide Bidders with sufficient time to perform due diligence and to acquire the information necessary to submit a timely and well-informed bid.

49.     The Bid Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest or best offer(s) for the purchase of any or all of the Debtors' Assets.  The Debtors therefore believe that submitting the purchase of their Assets to a market-based test will ensure maximum recovery for all stakeholders.  Accordingly, the Debtors and their stakeholders can be assured that the consideration obtained will be fair and reasonable.

---

[17]     *See, e.g., In re Dura Auto. Sys.*, 379 B.R. 257, 263 (Bankr. D. Del. 2017); *Integrated Res.*, 147 B.R. at 659 (providing that such procedures "encourage bidding and to maximize the value of the debtor's assets."); *In re Fin. News Network Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate.").

[18]     *See, e.g., In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.' If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale." (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Trans World Airlines Inc.*, No. 01-0056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor in effecting a § 363(b) sale.").

50.     Similar bidding, auction, and notice procedures have been previously approved by this Court in other chapter 11 cases.  *See, e.g.*, *In re Nogin, Inc*., Case No. 23-11945 (CTG) (Bankr. D. Del. Jan. 11, 2024); *In re Amyris, Inc.,* Case No. 23-11131 (TMH) (Bankr. D. Del. Oct. 16, 2023); *In re RTI Holding Co., LLC*, Case No. 20-12456 (JTD) (Bankr. D. Del. Nov. 20, 2020); *In re Forever 21, Inc.*, Case No. 19-12122 (KG) (Bankr. D. Del. Feb. 4, 2020); *In re Destination Maternity Corp.*, Case No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019). *iPic-Gold Class Entertainment, LLC*, Case No. 19-11739 (LSS) (Bankr. D. Del. Sept. 13, 2019); *In re Elk Petroleum, Inc.*, Case No. 19-11157 (LSS) (Bankr. D. Del. Aug. 1, 2019); *In re Achaogen, Inc.*, Case No. 19-10844 (BLS) (Bankr. D. Del. May 1, 2019).[19]

51.     In sum, the Debtors believe that the proposed Bid Procedures create an appropriate framework for expeditiously establishing that the Debtors are receiving the best and highest offers for their Assets.  Accordingly, the proposed Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances.

**B.     The Purchased Assets Should be Sold Free and Clear of Liens, Claims, and Encumbrances Pursuant to Section 363(f) of the Bankruptcy Code**

52.     In the interest of attracting the best offers, the Debtors request authorization to sell their Assets free and clear of any and all Encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such Encumbrances attaching to the proceeds of the Sale(s) of the Assets and distributed as provided for in a further order of the Bankruptcy Court.

53.     Under section 363(f) of the Bankruptcy Code, a debtor may sell estate property free and clear of liens, claims, encumbrances, and other interests if one of the following conditions is satisfied: (i) applicable non-bankruptcy law permits sale of such property free and clear of such

---

[19]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' counsel.

interest; (ii) such entity consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.[20]  Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens, claims, encumbrances, and other interests.[21]

54.     Furthermore, section 105(a) of the Bankruptcy Code grants the court broad discretionary powers, providing that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  This equitable power may be utilized to effectuate the provisions of section 363(f).[22]

55.     The Debtors will demonstrate at the Sale Hearing that the Sale(s) satisfies the requirements of section 363(f).  Accordingly, the Debtors request authorization to sell their Assets free and clear of all Encumbrances.

**C.    Successful Bidders Should Be Entitled to the Protections
of Section 363(m) of the Bankruptcy Code**

56.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.[23]  As noted above, any Purchase Agreement executed by a Successful Bidder will have been negotiated at arm's-length and in good faith in accordance with the Bid Procedures and Bid Procedures Order,

---

[20]    11 U.S.C. § 363(f).

[21]    *See, e.g.*, *In re Kellstrom Indust., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002); *In re Dundee Equity Corp.*, Case No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992).

[22]    *See, e.g., In re Trans World Airlines, Inc.*, 2001 Bankr. LEXIS 723, at *18-19 (Bankr. D. Del. Mar. 27, 2001) (highlighting bankruptcy courts' equitable authority to authorize sale of estate assets free and clear).

[23]    See, e.g., In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986); Miami Ctr. Ltd. P'ship v. Bank of New York, 838 F.2d 1547, 1554 (11th Cir. 1988); In re Mark BellFurniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985).

with each of the parties represented by its own advisors and counsel.  Accordingly, the Debtors request that the Sale Order include a provision that any Successful Bidder(s) for the Debtors' Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors maintain that providing the Successful Bidders with such protection will ensure that the maximum price will be received by the Debtors for the Assets.

### D.   Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Should be Authorized

57.     To enhance the value of the Debtors' estates, the Debtors request authority under section 365 of the Bankruptcy Code to assume and assign or transfer the Transferred Contracts to the Successful Bidder(s).  The Debtors further request that the Sale Order provide that the Transferred Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s) notwithstanding any provisions in such assigned contracts and/or leases, including those described in sections 365(b)(2), (f)(1), and (f)(3) of the Bankruptcy Code, that prohibit such assignments.

58.     A debtor may, subject to court approval, assume and assign executory contracts and unexpired leases under section 365(a) of the Bankruptcy Code.  Courts routinely approve motions to assume and assign executory contracts or unexpired leases upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.[24]  The assumption and assignment of the Transferred Contracts related to the Assets is an integral component of any Sale, without which a Sale would not be a viable option.

59.     Section 365(b)(1) of the Bankruptcy Code requires that, if there has been a default in a debtor's unexpired lease or executory contract, other than certain nonmonetary defaults as set

---

[24]     *In re Fleming Co. Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

forth in the statute, such unexpired lease or executory contract may not be assumed unless, at the time of the assumption, (i) such default is cured or there is adequate assurance that such default will be cured, (ii) compensation or adequate assurance of compensation is provided for any actual pecuniary loss resulting from such default, and (iii) adequate assurance of future performance under the lease is provided.[25]

60.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case but should be given "practical, pragmatic construction."[26]

61.     As set forth above, pursuant to the terms of the proposed Bid Procedures Order, the Debtors will send the Assumption and Assignment Notice and Additional Assumption and Assignment Notice, as applicable, to all Contract Counterparties to the Potential Assumed/Assigned Contracts notifying such Contract Counterparties of the potential assumption by the Debtors and assignment to the Successful Bidder(s) of such contract and/or lease.  The Assumption and Assignment Notice and Additional Assumption and Assignment Notice, as applicable, will also set forth the Cure Amount, if any, owing for all such contracts and/or leases according to the Debtors' books and records.

62.     Contract Counterparties to Potential Assumed/Assigned Contracts will be given sufficient time (as set forth herein and in the proposed Bid Procedures Order) to object to the proposed Cure Amounts, if any, set forth in the Assumption and Assignment Notice.  If no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the Debtors, the Successful Bidder(s), and the applicable Contract Counterparty.  The payment of

---

[25]    11 U.S.C. § 365(b)(1).

[26]    EBG Midtown South Corp. v. McLaren/Hart Env. Eng' g Corp. (In re Sanshoe Worldwide), 139 B.R. 585, 593 (S.D.N.Y. 1992); see also In re Fleming Co. Inc., 499 F.3d at 305; Cinicola v. Scharffeberger, 248 F.3d 110, 120 (3d Cir. 2001).

the Cure Amounts specified in the Assumption and Assignment Notice or Additional Assumption and Assignment Notice (or a different amount, either agreed to by the Debtors or resolved by this Court as a result of a timely-filed objection by the relevant Contract Counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the Contract Counterparties for any pecuniary losses under the applicable Transferred Contracts pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine, before the Sale Hearing, that a particular lease or contract is not executory or unexpired, and does not need to be cured to transfer the Assets to the relevant Successful Bidder.

63.     Section 365(f) of the Bankruptcy Code states that a debtor may assign its unexpired leases and executory contracts if, *inter alia,* the assignee provides "adequate assurance of future performance."[27]  If necessary, the Successful Bidder(s) must submit, among other things, written evidence of the ability to provide adequate assurance of future performance under the applicable contracts or leases as set forth above and in the Bid Procedures Order.  The affected Contract Counterparties will also be able to challenge the ability of the Successful Bidder(s) to provide adequate assurance as provided in the Bid Procedures Order.

64.     Any assumption and assignment of the Transferred Contracts will be subject to all of the provisions of such contract and/or lease, to the extent required by applicable law and in accordance with applicable provisions of the Bankruptcy Code.  The Bid Procedures are designed to ensure that any Successful Bidder(s) is financially able and prepared to undertake all of the relevant obligations under the Transferred Contracts.  The Debtors, together with the relevant Successful Bidder, will establish, as necessary, at the Sale Hearing, the requisite adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code with respect to

---

[27]   11 U.S.C. § 365(f)(2)(B).

the potential assumption and assignment of the applicable Transferred Contracts. Consequently, assumption and assignment of the Transferred Contracts in connection with the Sale(s) is appropriate under the circumstances.

**E.     The Bid Protections are Necessary and Appropriate and Should be Approved**

65.     The Debtors submit that the Bid Protections are a normal and necessary component of transactions outside the ordinary course of business under section 363 of the Bankruptcy Code. In particular, such protections encourage a potential transaction counterparty to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.[28] Bid Protections, if any, will only be paid out of the cash proceeds of a Sale Transaction arising from a Topping Bid or Overbid, as applicable.

66.     A proposed bidding incentive, such as the Bid Protections, should be approved when it is in the best interests of the estate.[29] Typically, this requires that the bidding incentive provide some benefit to the debtor's estate.[30]

---

[28]     *See, e.g., In re Integrated Resources, Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

[29]     *See In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992).

[30]     *Calpine Corp. v. O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

67.    In *O'Brien Environmental Energy*, the United States Court of Appeals for the Third Circuit found that whether breakup fees and expenses could be paid to a "stalking horse" bidder depended on whether such fees were necessary to preserve the value of the estate.[31]  Providing such protections would be appropriate, the court held, where the bidder provides a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company.[32]  The Debtors believe that approval of the Bid Protections will promote a competitive bidding process.

68.    The Debtors believe that the proposed Bid Protections are fair and would reasonably compensate any Stalking Horse Bidder(s) for taking actions that will benefit the Debtors' estates.  The Bid Protections compensate the Stalking Horse Bidder(s) for diligence and professional fees incurred in negotiating the terms of the Purchase Agreement on an expedited timeline.

69.    The Debtors do not believe that the Bid Protections will have a chilling effect on the Sale Process.  Rather, any Stalking Horse Bidder(s) will increase the likelihood that the Debtors will receive the best possible price for the Assets by permitting other Qualified Bidders to rely on the diligence performed by the Stalking Horse Bidder(s), and moreover, by allowing Qualified Bidders to utilize the Stalking Horse Agreement(s) (if executed) as a platform for negotiations and modifications in the context of a competitive bidding process.  Accordingly, the Bid Protections satisfy the requirements for approval in this Circuit and should be approved.

---

[31]    *See* 181 F.3d at 536.

[32]    *Id.* at 537.

**F.      The Proposed Notices Are Appropriate Under Bankruptcy Rule 2002**

70.      The notices contemplated by the Bid Procedures give notice of the proposed Sale Process including a disclosure of the time, place, and methodology of the Auction, the terms and conditions for being a Qualified Bidder, the necessary terms to be included in any proposed Sale Transaction(s), and the deadline for filing any objections to the Sale Process or any part thereof. The Debtors submit that the notice procedures comply with Bankruptcy Rule 2002 and include information regarding the Bid Procedures necessary to enable interested Bidders to participate in the Auction, and constitute good and adequate notice of the Bid Procedures and the other components of the Sale Process.   Therefore, the Debtors respectfully request that this Court approve the proposed notice procedures.

**G.      Relief from Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

71.      Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.[33] Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen (14) days, unless the court orders otherwise.

72.      To maximize the value of the Debtors' estates, it is critical that the Debtors close the Sale(s) of the Assets as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

---

[33]    *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

## NO PRIOR REQUEST

73.     No prior request for the relief sought in this Motion has been made to this or any other court.

## NOTICE

74.     The Debtors will provide notice of this Motion to the following Sale Notice Parties: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the DIP Secured Parties and the Prepetition Secured Parties; (c) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis and counsel to any official committee appointed in these Chapter 11 Cases; (d) all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; (e) all parties reasonably known to the Debtors that assert liens, claims, and encumbrances, and other interests with respect to the Assets; (f) all entities known to have expressed an interest in bidding on the Assets; (g) all known counterparties to the Debtors' executory contracts and unexpired leases; and (h) the Internal Revenue Service, the Securities and Exchange Commission, and any other federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or order of the Court.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Bid Procedures Order and grant the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: February 12, 2024

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
         dbertenthal@pszjlaw.com
         tcairns@pszjlaw.com

-and-

Joshua A. Sussberg, P.C. (*pro hac vice pending*)
Nicole L. Greenblatt, P.C. (*pro hac vice pending*)
Elizabeth H. Jones (*pro hac vice pending*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com
              nicole.greenblatt@kirkland.com
              elizabeth.jones@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*