## EXHIBIT B

## Complaint

E-FILED
9/16/2021 5:03 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV388667
Reviewed By: Victoria Castaneda

1  GREGORY L. BENTLEY #151147
   FARNAZ SALESSI #327289
2  **BENTLEY & MORE LLP**
3  4931 Birch Street
   Newport Beach, California 92660
4  Telephone:    (949) 870-3800
5  Facsimile:    (949) 732-6291

6
   CHRISTOPHER ESTES *(Pending pro hac vice admission)*
7  **ESTES LAW FIRM, LLC**
8  105 North Conception Street
   Mobile, Alabama 36602
9  Telephone:    (251) 476-9009
10 Facsimile:    (251) 445-3269

11
   Attorneys for Plaintiff, Lisa Authement
12

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA
14                  FOR THE COUNTY OF SANTA CLARA
15

16  LISA AUTHEMENT, an individual,          Case No.:    21CV388667
17
            Plaintiff,                       **COMPLAINT AND DEMAND FOR**
18                                           **JURY TRIAL**
19      vs.
                                             1.  Strict Products Liability
20                                           2.  Negligent Products Liability
    MIRADRY, INC., a Delaware               3.  Negligence
21  corporation with its principal place of 4.  Intentional
22  business in California; SIENTRA, INC., a     Misrepresentation/Concealment
    Delaware corporation with its principal 5.  Negligent
23  place of business in California; and         Misrepresentation/Concealment
24  DOES 1-100 inclusive,

25          Defendants.
26

27

28

## I.    INTRODUCTION

1.    Defendants MiraDry, Inc. and Sientra, Inc. design, manufacture, and market the MiraDry System (the "System")—a self-proclaimed "revolutionary" device that delivers microwave energy below the skin of the underarms in order to destroy sweat glands. The System includes five level settings which control the microwave energy that is released, with energy level 5 releasing the greatest amount of energy.

2.    The FDA has approved the MiraDry System as a Class II medical device through the 510(k) clearance process for the treatment of primary axillary hyperhidrosis—the clinical condition of abnormal, excessive sweating in the underarms. Since receiving FDA approval, Defendants have touted the MiraDry System as "safe," with side effects that are generally mild and limited, and with "little to no downtime."[1] Yet since *at least* 2012, Defendants have known that using the System at higher energy levels—particularly energy level 5—can *significantly increase* the risk of adverse side effects to patients, including ulcers, burns, nerve damage, and infection. In order to minimize the risk of side effects, MiraDry's longstanding recommended protocol was to use the System at low energy levels (levels 1-3) over two separate treatments. However, these recommendations and safety precautions would soon be disregarded in the interest of profit.

3.    In 2015, MiraDry released a new Optimized Treatment Protocol ("OTP"), developed by MiraDry's then-Vice President of Marketing, Robert Ellis, and approved by MiraDry's entire executive team. In disturbing contrast to MiraDry's prior recommendations of using the System at low energy levels over two separate sessions, the OTP recommended that the System be used on patients at energy level 5 *consistently*. Though MiraDry claimed that doing so would "increase patient satisfaction," MiraDry also *admitted* that the goal of the

---

[1] https://www.miradry.com/faqs/

1    OTP was to reduce the number of required treatments to one session—as treating
2    patients at level 5 made it more likely that their sweat glands would be destroyed
3    after only one treatment, as opposed to two—thereby making the System more
4    attractive and significantly boosting demand. Defendants demonstrated little, if
5    any, concern for the heightened risk of adverse side effects, including ulcers,
6    burns, nerve damage, and infection, as they continued to promote use of the
7    System at energy level 5, and failed to appropriately disclose that risk to
8    physicians and the public at large.

9        4.      In addition to recommending that the System be used at energy
10   level 5, in 2015 MiraDry also began to promote the System as a solution for
11   anyone that is bothered by their sweat to any degree, rather than those who
12   suffer from primary axillary hyperhidrosis, or *excessive* sweating—the use for
13   which the MiraDry System was FDA-approved. This deceptive marketing tactic
14   has continued to the present day, though MiraDry has never obtained FDA
15   approval for use by anybody who sweats, to any degree.

16       5.      MiraDry's drastic actions—which were a complete shift from the
17   company's long-standing recommendations regarding safe operation of the
18   System, and which blatantly violated federal law prohibiting promotion of
19   medical devices for non-approved use—were fueled by the company's effort to
20   reduce its massive liabilities and generate much-needed demand for the System.
21   In fact, as of March 2016, MiraDry's liabilities were $96.8 million, with significant
22   net losses recorded every single year since its inception—facts which the
23   company admitted "raise[d] substantial doubt about the Company's ability to
24   continue as a going concern."[2]

25       6.      In or about September 2019, Plaintiff Lisa Authement learned of the
26   MiraDry procedure and visited the MiraDry website, where she read statements
27   widely circulated by MiraDry—including that the System was "safe," and that

28   _____

[2] https://www.sec.gov/Archives/edgar/data/1586727/000162828016017099/miramar-061316x8ka.htm

1   side effects consisted of "some localized soreness or swelling," with "some

2   patients [having] short-term altered sensation in the skin of their underarms or

3   upper arms which gradually disappears." Significantly, MiraDry's website

4   claimed that the System was "for ***anyone*** who is bothered by underarm sweat"—

5   just one of many public statements which demonstrated Defendants' widespread

6   promotion of the System for non-approved, off-label use on patients who did *not*

7   suffer from hyperhidrosis. (Emphasis added.)

8       7.      In or about September 2019, Plaintiff visited Eastern Shore

9   Cosmetic Surgery in Fairhope, Alabama to seek a consultation for

10  treatment with the MiraDry System. On information and belief, Defendants had

11  trained, suggested to, and/or instructed relevant clinicians and employees at

12  Eastern Shore Cosmetic Surgery that the System was safe for use on anyone who

13  was bothered by their sweat, rather than merely those suffering from primary

14  axillary hyperhidrosis. On information and belief, Defendants also trained,

15  instructed, suggested, and/or recommended Eastern Shore Cosmetic Surgery

16  clinicians to select energy level 5 of the System to treat patients.

17      8.      On September 19, 2019, Plaintiff was treated at an energy level 5

18  with the MiraDry System. Immediately afterwards, she felt pain and a burning

19  sensation in her underarms, but, consistent with MiraDry's corporate materials,

20  was told those symptoms were normal and would shortly resolve.

21      9.      Unfortunately, that was not the case. Over the weeks and months

22  that followed, Plaintiff's symptoms progressively worsened from red splotches

23  on her underarms to gaping, infection-filled ulcers that caused Plaintiff immense

24  pain, limiting her mobility. Plaintiff's injuries are depicted in the photos on the

25  next page.

26      10.     More than a year after treatment with the MiraDry System, Plaintiff

27  has been left with severe and unsightly scarring in her underarms and nerve

28  deficits.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

 

16    *Plaintiff's left and right underarms following treatment with the MiraDry System.*

17

18        11.    Plaintiff's experience with the MiraDry System is not an isolated

19    occurrence; hundreds, if not thousands, of Adverse Event Reports have been

20    made to the FDA regarding the MiraDry System, reporting issues including

21    ulcers, burns, nerve damage, and infection, while numerous medical

22    practitioners administering treatment with the MiraDry System report that the

23    System has caused brachial plexus nerve injury in their patients.[3] [4] Considering

24    the method by which the MiraDry System works—administering amounts of

25    microwave energy severe enough to destroy sweat glands—it is not surprising

26    that the procedure may have severe side effects. In fact, per MiraDry's own

27

28    [3] https://www.nytimes.com/2011/12/08/fashion/sweat-and-tears-first-person.html
      [4] https://www.ncbi.nlm.nih.gov/pubmed/30703585

1    recommendations in 2011, during the early release of the MiraDry System,

2    medical practitioners should use the *lowest* energy setting in the upper part of the

3    underarm, where nerves are closest to the surface, in order to reduce the risk of

4    nerve damage.[5] Yet, following release of the OTP in 2015, and in a transparent

5    scheme to increase profits, Defendants proceeded to widely train, instruct,

6    suggest, and/or recommend clinicians that the System be used at an energy level

7    5.

8         12.    Defendants advertised, and continue to advertise, the MiraDry

9    System as a safe treatment for underarm sweating. However, Defendants have

10   defectively designed and manufactured a product that creates a high risk of

11   injury, including ulcers, burns, nerve damage, and infection, and have failed to

12   warn the public, including Plaintiff, as to the high risk of such injuries associated

13   with the product, while actively suggesting and recommending that clinicians

14   use the System on patients at energy level 5—a level known to carry a higher risk

15   of causing adverse side effects. Defendants' actions have caused Plaintiff severe

16   and lasting pain and injury.

17

18                    **II.    VENUE AND JURISDICTION**

19        13.    This Court has personal jurisdiction over Defendants MiraDry, Inc.,

20   and Sientra, Inc., which are and were at all relevant times residents of and/or

21   authorized to conduct business in the State of California and conducted such

22   business within the State including the performance of acts that caused or

23   contributed to the harm giving rise to this action.

24        14.    MiraDry's primary worldwide entity address is 2790 Walsh

25   Avenue, Santa Clara, CA 95051, from which MiraDry's high level officers direct,

26   control, and coordinate MiraDry's activities. Because MiraDry's principal place

27

28   _____
     [5] https://www.wsj.com/articles/SB10000872396390444772404577587134096349766

1    of business, or "nerve center," is located in California, MiraDry will be subject to

2    general jurisdiction in California.

3         15.    Sientra's primary worldwide entity address is 420 South Fairview

4    Avenue, Suite 200, Santa Barbara, CA 93117, from which Sientra's high level

5    officers direct, control, and coordinate Sientra's activities. Because Sientra's

6    principal place of business, or "nerve center," is located in California, Sientra will

7    be subject to general jurisdiction in California.

8         16.    Defendants MiraDry and Sientra designed, developed,

9    manufactured, and sold the MiraDry System from California.

10        17.    At all times material hereto, Defendants MiraDry and Sientra

11   maintained systematic and continuous contacts in this judicial district, regularly

12   transacted business within this judicial district, employed numerous individuals

13   in this district and regularly availed themselves of the benefits of this judicial

14   district. Defendants received substantial financial benefit and profits as a result

15   of the designing, formulating, testing, packaging, labeling, producing, creating,

16   constructing, making, assembling, advertising, marketing, promoting,

17   distributing, manufacturing, and selling the MiraDry System in this state and

18   county, and throughout the United States. Defendants promoted, sold,

19   distributed, made, assembled, marketed, advertised, and promoted the MiraDry

20   System in California.

21        18.    At all times material hereto, the action arises from obligations that

22   arise out of or are connected with, Defendants' activities within the State of

23   California.

24        19.    Plaintiff is informed and believes, and on that basis alleges that

25   Defendants have purposefully directed their activities at this forum State and the

26   exercise of jurisdiction is reasonable and would not offend the traditional notions

27   of fair play and substantial justice.

28        20.    Plaintiff is informed and believes, and on that basis alleges that

COMPLAINT AND DEMAND FOR JURY TRIAL

1    Defendants have purposefully availed themselves of the privileges and benefits

2    of conducting activities and business within the forum State, and have invoked

3    the benefits and protections of its laws.

4        21.    A substantial part of the events giving rise to Plaintiff's claims

5    occurred in California, including communication regarding the products at issue,

6    the design, formulation, testing, packaging, labeling, production, creation,

7    construction, making, assembly, advertising, testing, marketing, promotion,

8    distribution, manufacturing, and selling of the MiraDry System.

9

10                      **III.    THE PARTIES**

11       22.    Plaintiff, Lisa Authement, is and at all relevant times was a resident of the

12   County of Jackson, State of Mississippi.

13       23.    Defendant MiraDry, Inc. is a Delaware corporation with its principal

14   place of business in Santa Clara, California. MiraDry's registered agent for service of

15   process is CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N,

16   Sacramento, California 95833. MiraDry's primary worldwide entity address is 2790

17   Walsh Avenue, Santa Clara, CA 95051.

18       24.    Defendant Sientra, Inc. is a Delaware corporation with its principal

19   place of business in Santa Barbara, California. Sientra's registered agent for service of

20   process is Registered Agent Solutions, Inc., 1220 S Street, Suite 150, Sacramento,

21   California 95811. Sientra's primary worldwide entity address is 420 South Fairview

22   Avenue, Suite 200, Santa Barbara, CA 93117.

23       25.    The true names and capacities, whether individual, corporate, associate or

24   otherwise, of Defendants Does 1-100, inclusive, and each of them, are unknown to

25   Plaintiff, who thereby sues these Defendants by such fictitious names, and will ask

26   leave of this court to amend this complaint when the true names are ascertained.

27       26.    Plaintiff is informed and believes and on that basis alleges that each

28

1    Defendant named herein as a Doe is responsible in some manner for the events and

2    happenings referred to herein which proximately caused injury to Plaintiff as

3    hereinafter alleged.

4        27.    Plaintiff is informed and believes and on that basis alleges that at all times

5    mentioned herein Defendants, and each of them, were the agents, servants, employees,

6    and joint venturers of each other, and were as such acting within the course, scope and

7    authority of said agency and employment and or joint venture, and that each and every

8    Defendant, when acting as a principal, was negligent and reckless in the selection,

9    hiring, entrustment and supervision of each and every other Defendant as an agent,

10   servant, employee, or joint venturer.

11

12                    **IV.    FACTUAL BACKGROUND**

13   **A.    Background of the MiraDry System**

14       28.    The MiraDry System was developed in or around 2011 by Miramar Labs,

15   Inc., which would go on, through several name changes, to become MiraDry, Inc. The

16   System has been given Class II medical device approval for the treatment of primary

17   axillary hyperhidrosis, or excessive sweating in the underarms, by delivering

18   microwave energy to the area below the skin to destroy sweat glands.

19       29.    In 2011, 2013, 2016, and 2018 the FDA approved the MiraDry System as a

20   Class II medical device through the 510(k) clearance process, as the System was

21   demonstrated to be substantially equivalent to a legally marketed device that was not

22   subject to premarket approval. (Exhibit A.) The 510(k) clearance process essentially

23   consists of the FDA determining whether a product submitted for approval is

24   substantially equivalent to one that has been approved by the FDA in the past. If so, the

25   substantially equivalent device is also approved. Notably, the 510(k) clearance process

26   is much less stringent than the process for pre-market approval, which requires an in-

27   depth review of the medical device. Also notable is the fact that the FDA did not subject

28   the MiraDry System to any special controls—meaning that Defendants were not subject

BENTLEY & MORE LLP

TELLING YOUR STORY

1    to any device-specific guidance. Because the MiraDry System is not subject to pre-
2    market approval and is not subject to any special controls, it will not be subject to
3    preemption under the Food, Drug, and Cosmetic Act. (See *Medtronic, Inc. v. Lohr* (1996)
4    518 U.S. 470, 494.)

5          30.    The MiraDry System delivers microwave energy below the skin in order
6    to destroy sweat glands, and includes five level settings which control the energy that is
7    released, with energy level 5 releasing the greatest amount of energy. Defendants have
8    long represented that the MiraDry System is "safe" and that side effects associated with
9    the MiraDry System are generally mild and limited, with "little to no downtime."[6] Yet
10   since *at least* 2012, Defendants have known that using the System at higher energy
11   levels—particularly energy level 5—can *significantly increase* the risk of adverse side
12   effects to patients, including ulcers, burns, nerve damage, and infection. In fact,
13   MiraDry's longstanding recommended protocol was to use the System at low energy
14   levels (levels 1-3) over two separate treatments. However, these recommendations and
15   safety precautions would soon be disregarded in the interest of profit.

16         31.    In 2015, MiraDry released a new Optimized Treatment Protocol
17   ("OTP"), developed by MiraDry's then-Vice President of Marketing, Robert Ellis, and
18   approved by the entire executive team at MiraDry. In disturbing contrast to MiraDry's
19   prior recommendations of using the System at low energy levels over two separate
20   sessions, the OTP recommended that the System be used on patients at energy level 5
21   *consistently*. Though MiraDry claimed that doing so would "increase patient
22   satisfaction," MiraDry also *admitted* that the goal of the OTP was to reduce the number
23   of required treatments to one session—as treating patients at level 5 made it more likely
24   that their sweat glands would be destroyed after only one treatment, as opposed to
25   two—thereby making the System more attractive and significantly boosting demand.

26         32.    In addition to recommending that the System be used at energy level 5, in
27   2015 MiraDry also began to promote the System as a solution for "anyone that is

28   ───────────────
[6] https://www.miradry.com/faqs/

BENTLEY & MORE ᴸᴸᴾ

TELLING YOUR STORY

B⋅M

1   bothered by their sweat to any degree," rather than those who suffer from primary
2   axillary hyperhidrosis, or *excessive* sweating—the use for which the MiraDry System
3   was FDA-approved. MiraDry's marketing materials note that only about 8 million
4   people in the United States have been diagnosed with hyperhidrosis, whereas there are
5   over 42 million U.S. adults bothered by their sweat, going on to specifically state that
6   the company was going to target "anybody bothered by sweat." (Exhibit B, select slides
7   from MiraDry's July 22, 2015 marketing webinar.) This deceptive marketing tactic has
8   continued to the present day, though MiraDry has never obtained FDA approval for
9   use by people who are merely bothered by their sweat.

10   33.     MiraDry's drastic actions—which were a complete shift from the
11   company's long-standing recommendations regarding safe operation of the System, and
12   which blatantly violated federal law prohibiting promotion of medical devices for non-
13   approved use—were fueled by the company's effort to reduce its massive liabilities and
14   generate much-needed demand for the System. In fact, as of March 2016, MiraDry's
15   liabilities were $96.8 million, with significant net losses recorded every single year since
16   its inception—facts which the company admitted "raise[d] substantial doubt about the
17   Company's ability to continue as a going concern."[7] Yet Defendants demonstrated little,
18   if any, concern for the heightened risk of adverse side effects, including ulcers, burns,
19   nerve damage, and infection, as they continued to promote use of the System at energy
20   level 5, and failed to appropriately disclose that risk to physicians and the public at
21   large. In fact, Defendants advertised, and continue to advertise, the MiraDry System as
22   a safe method for reducing sweating in the underarms.

23

24   **B.     The failed MiraDry procedure that changed Lisa's life**

25   34.     Lisa is a 63-year-old mother of three and real estate broker working in the
26   Mississippi and Alabama areas. In or about September 2019, Lisa learned of the
27   MiraDry procedure and visited the MiraDry website, where she read statements widely
28   _____

[7] https://www.sec.gov/Archives/edgar/data/1586727/000162828016017099/miramar-061316x8ka.htm

1    circulated by Defendants MiraDry and Sientra—including that the System was "safe,"

2    that side effects consisted of "some localized soreness or swelling," with "some patients

3    [having] short-term altered sensation in the skin of their underarms or upper arms

4    which gradually disappears." Lisa also read Defendants' statement that the System was

5    "for *anyone* who is bothered by underarm sweat"—just one of many statements by

6    Defendants which demonstrated their widespread promotion of the System for non-

7    approved, off-label use on patients who did *not* suffer from hyperhidrosis. (Emphasis

8    added.) Believing Defendants' representations that the System was safe, had minimal,

9    temporary side effects, and was appropriate for use by anyone bothered by their

10   underarm sweat, Lisa decided to undergo the MiraDry procedure.

11        35.    In or about September 2019, Plaintiff visited Eastern Shore

12   Cosmetic Surgery in Fairhope, Alabama to seek a consultation for treatment with the

13   MiraDry System. On information and belief, Defendants had trained, instructed and/or

14   suggested to relevant Eastern Shore Cosmetic Surgery employees and clinicians that the

15   System was safe for use on anyone who was bothered by their sweat, rather than

16   merely those who had hyperhidrosis. On information and belief, Defendants also

17   trained, instructed, suggested, and/or recommended that relevant Eastern Shore

18   Cosmetic Surgery clinicians select energy level 5 to treat patients.

19        36.    On September 19, 2019, Lisa was treated at an energy level 5

20   with the MiraDry System by one or more clinicians at Eastern Shore Cosmetic

21   Surgery—consistent with the training, instructions, suggestions, and/or

22   recommendations that MiraDry is believed to have directly provided to those clinicians.

23   Immediately afterwards, Lisa felt pain and a burning sensation in her underarms, but,

24   consistent with MiraDry's corporate materials, was told those symptoms were normal

25   and would shortly resolve.

26        37.    Unfortunately, that was not the case. Over the weeks and months that

27   followed, Lisa's symptoms progressively worsened—from red splotches on her

28

1 underarms to gaping, infection-filled ulcers that caused her immense pain, severely

2 limiting her mobility.

3       38.     More than a year after treatment with the MiraDry System, Lisa

4 has been left with severe and unsightly scarring in her underarms and nerve deficits.

5 Additional future treatment is likely, and Lisa's injuries are likely permanent.

6

7                    **FIRST CAUSE OF ACTION**

8                     **(Strict Products Liability)**

9       PLAINTIFF LISA AUTHEMENT FOR A FIRST CAUSE OF ACTION AGAINST

10 DEFENDANTS MIRADRY, INC., SIENTRA, INC., AND DOES 1-100, INCLUSIVE, FOR

11 STRICT PRODUCTS LIABILITY, ALLEGES:

12       39.     Plaintiff refers to each and every preceding paragraph and incorporates

13 those paragraphs as though set forth in full in this cause of action.

14       40.     At all times mentioned herein, Defendants MiraDry, Inc. and Sientra, Inc.

15 and Does 1-100, inclusive, were engaged in the business of manufacturing, fabricating,

16 designing, assembling, distributing, selling, inspecting, warranting, leasing, renting,

17 retailing, wholesaling, and advertising the MiraDry System operated on Plaintiff.

18       41.     On September 19, 2019, the MiraDry System was operated at an energy

19 level 5 on Plaintiff in a reasonably foreseeable and intended manner. As a result,

20 Plaintiff experienced severe ulcers, burns, nerve deficits, and infection.

21       42.     Defendants and Does 1-100, inclusive, knew that consumers would use

22 the MiraDry System as clinicians at Eastern Shore Cosmetic Surgery and Plaintiff did on

23 September 19, 2019. On information and belief, Defendants and Does 1-100 even

24 trained, instructed, suggested, and/or recommended clinicians at Eastern Shore

25 Cosmetic Surgery to use the System at a level 5 on patients.

26       43.     Defendants and Does 1-100, inclusive, manufactured, designed,

27 assembled, packaged, tested, fabricated, inspected, marketed, distributed, and sold the

28 MiraDry System and each of its component parts with defects in both design and

1  manufacturing which made them dangerous, hazardous, and unsafe for their intended

2  and reasonably foreseeable use.

3      44.    The design and manufacturing defects in the MiraDry System included:

4  defective and unsafe design, which resulted in excessive administration of microwave

5  energy resulting in ulcers, burns, nerve damage, and infection in the course of intended

6  use.

7      45.    The MiraDry System contained a design and/or manufacturing defect

8  when the MiraDry System was introduced into the stream of commerce by Defendants

9  and Does 1-100, inclusive.

10      46.    The MiraDry System was defective and unsafe for its intended use. Due to

11  the design and/or manufacturing defects, the MiraDry System failed to perform as

12  safely as an ordinary consumer would expect when used in an intended or reasonably

13  foreseeable manner.

14      47.    Furthermore, the risk of danger in the design of the MiraDry System

15  outweighed any benefits of the design and safer alternative designs were available at

16  the time of manufacture. Therefore, the MiraDry System presented a substantial and

17  unreasonable risk of serious injuries to users of the MiraDry System.

18      48.    The defects in the design and manufacture of the MiraDry System and its

19  component parts were a substantial factor in causing Plaintiff's severe injuries and

20  damages as herein alleged.

21      49.    Defendants and Does 1-100, inclusive, had actual or constructive

22  knowledge of the risks inherent in the MiraDry System at the time that the System was

23  used on Plaintiff, and that the MiraDry System could cause nerve damage.

24      50.    The inherent risks and dangers in using the MiraDry System in an

25  intended or reasonably foreseeable way presented a substantial danger to Plaintiff.

26      51.    An ordinary consumer, such as Plaintiff, would not have recognized the

27  potential risks and dangers inherent in the MiraDry System.

28      52.    Defendants and Does 1-100, inclusive, failed to warn of the dangers in the

1    reasonably foreseeable use of the MiraDry System. Nowhere does the product or

2    advertising for the product warn of the risk of large ulcers, severe burns and infection,

3    permanent scarring, or nerve damage (particularly long-lasting or permanent nerve

4    damage). There were simply no warnings about the hazards inherent in the MiraDry

5    System.

6        53.    Defendants' and Does 1-100s', inclusive, failure to warn of the risks and

7    instructions on safe use was a substantial factor in causing Plaintiff's severe injuries and

8    damages as herein alleged.

9        54.    As a result of the defective MiraDry System, and Defendants' and Does 1-

10    100s', inclusive, failure to warn and instruct on safe use of the System, Plaintiff

11    sustained severe personal injuries and damages, as alleged herein:

12            1)    Plaintiff has suffered, continues to suffer, and will in the future

13                suffer great mental, physical and emotional pain, in sums

14                according to proof at the time of trial; and

15            2)    Plaintiff was required to, and did, and will in the future, employ

16                physicians and surgeons to examine, treat and care for her, and

17                did and will in the future incur medical and incidental expenses for

18                such care and services, in a sum according to proof at the time of

19                trial.

20

21        **SECOND CAUSE OF ACTION**

22        **(Negligent Products Liability)**

23    PLAINTIFF LISA AUTHEMENT FOR A SECOND CAUSE OF ACTION

24    AGAINST DEFENDANTS MIRADRY, INC., SIENTRA, INC., AND DOES 1-100,

25    INCLUSIVE, FOR NEGLIGENT PRODUCTS LIABILITY, ALLEGES:

26        55.    Plaintiff refers to each and every preceding paragraph and incorporates

27    those paragraphs as though set forth in full in this cause of action.

28        56.    Defendants and Does 1-100, inclusive, negligently, recklessly and

1     carelessly manufactured, fabricated, designed, assembled, distributed, sold, inspected,

2     warranted, and advertised the MiraDry System such that it was dangerous and unsafe

3     for its intended and/or reasonably foreseeable use.

4       57.    Defendants and Does 1-100, inclusive, owed a duty to Plaintiff to exercise

5     reasonable care in the design, manufacture, and sale of the MiraDry System, to ensure

6     the MiraDry System was safe for its reasonably foreseeable use.

7       58.    Defendants and Does 1-100, inclusive, failed to exercise the amount of care

8     in the design, manufacture, and sale of the MiraDry System, that a reasonably careful

9     manufacturer, designer, seller, wholesaler, or distributor would have used in similar

10    circumstances to avoid exposing others to a foreseeable risk of harm.

11       59.    Defendants and Does 1-100, inclusive, knew or reasonably should have

12    known that the MiraDry System was dangerous when used or misused in a reasonably

13    foreseeable manner.

14       60.    Defendants and Does 1-100, inclusive, knew or reasonably should have

15    known that users would not realize the danger of ulcers, burns, infection, and nerve

16    damage.

17       61.    Defendants and Does 1-100, inclusive, failed to adequately warn of the

18    dangers of ulcers, burns, infection, and nerve damage, or instruct on the safe use of the

19    MiraDry System.

20       62.    A reasonable manufacturer, designer, seller, wholesaler, or distributor in

21    similar circumstances would have warned of the danger, or instructed on safe use of the

22    product.

23       63.    Defendants' and Does 1-100s', inclusive, failure to warn or instruct was a

24    substantial factor is causing Plaintiff's harm.

25       64.    As a proximate result of said negligent conduct, Plaintiff suffered injuries

26    as previously alleged. The negligence of Defendants and Does 1-100, inclusive, was a

27    substantial factor in causing the serious injuries to Plaintiff as previously alleged.

28       65.    Plaintiff incorporates by reference the damage allegations of paragraph 53

1    alleged against Defendants and Does 1-100, inclusive, as though fully set forth herein.

2

3                              **THIRD CAUSE OF ACTION**

4                                    **(Negligence)**

5        PLAINTIFF LISA AUTHEMENT FOR A THIRD CAUSE OF ACTION AGAINST

6    DEFENDANTS MIRADRY, INC., SIENTRA, INC., AND DOES 1-100, INCLUSIVE, FOR

7                              NEGLIGENCE, ALLEGES:

8        66.    Plaintiff refers to each and every one of the above paragraphs and

9    incorporates those paragraphs as though set forth in full in this cause of action.

10       67.    At all times material hereto, Defendants and Does 1-100, directly or

11   indirectly, created, manufactured, assembled, designed, sterilized, tested, packaged,

12   labeled, marketed, promoted, advertised, sold and/or distributed into the stream of

13   commerce the MiraDry System MD4000, including the MiraDry System operated on

14   Plaintiff.

15       68.    At all relevant times, Defendants and Does 1-100 owed a duty to the

16   public and to Plaintiff, to exercise reasonable care in the design, manufacture, testing,

17   processing, advertising, marketing, testing, labeling, assembling, packaging,

18   distribution, promotion, and sale of the MiraDry System.

19       69.    Defendants and Does 1-100 negligently breached that duty to the Plaintiff

20   in one or more of the following ways:

21       (a)    Failing or refusing to properly meet the applicable standard of care by not

22              complying with applicable federal laws and regulations in marketing,

23              promoting, and/or advertising the MiraDry System, including but not

24              limited to violating 21 U.S.C. § 352(q) by marketing, promoting, and/or

25              advertising the MiraDry System as appropriate for anyone who is

26              bothered by their sweat, as opposed to merely those who suffer from

27              primary axillary hyperhidrosis. Notably, the MiraDry System has been

28

1    given FDA approval for treatment of primary axillary hyperhidrosis—*not*

2    treatment of those who are merely *bothered* by their sweat;

3    (b)    Failing or refusing to include adequate warnings with the device that

4    would alert Plaintiff and her clinicians at Eastern Shore Cosmetic Surgery

5    to the potential risks and serious side effects of the MiraDry System;

6    (c)    Failing or refusing to warn, or adequately warn, the Plaintiff or her

7    clinicians at Eastern Shore Cosmetic Surgery that use of the MiraDry

8    System at energy level 5 created a higher risk of adverse side effects,

9    including but not limited to ulcers, burns, infection, and nerve damage;

10    (d)    Training, suggesting, recommending, and/or instructing clinicians—

11    including, on information and belief, Plaintiff's clinicians at Eastern Shore

12    Cosmetic Surgery—to use the System at energy level 5 on patients, despite

13    having knowledge of the increased risk of adverse side effects arising

14    from such usage;

15    (e)    Placing an unsafe and defective device into the stream of commerce; and

16    (f)    Underplaying the significant risks posed by the MiraDry System—

17    particularly when the System is used at energy level 5—to the public,

18    including the Plaintiff and her clinicians at Eastern Shore Cosmetic

19    Surgery, in order to make a profit from sale of the device.

20    70.    Because of the negligence of Defendants and Does 1 through 100,

21    inclusive, Plaintiff suffered ulcers, burns, infection, nerve deficits, and scarring in her

22    underarms.

23    71.    As a direct and proximate result of Defendants' and Does 1-100s' conduct,

24    Plaintiff was hurt and injured in her health, strength, and activity, sustaining injuries

25    which caused and continue to cause her great mental, physical, and nervous pain and

26    suffering.  Plaintiff's general damages are in an amount in excess of the minimum

27    jurisdictional limits of the Superior Court.

28    72.    As a further direct and proximate result of the negligent, careless, and

1   unlawful conduct of defendants, Plaintiff has incurred and will in the future incur

2   surgical, medical, and sundry expenses in the examination, care, and treatment of her

3   injuries, the exact nature and amount of which are unknown to Plaintiff at this time, but

4   shall be shown by an amount to be proven at trial.

5          73.    Finally, as a further direct and proximate result of Defendants' and Does

6   1-100s' conduct, Plaintiff suffered past and future noneconomic damages, including but

7   not limited to, physical pain, inconvenience, mental suffering, loss of enjoyment of life,

8   grief, anxiety, humiliation, physical impairment, emotional distress, and disfigurement,

9   all in an amount to be determined at trial.

10

11                    **FOURTH CAUSE OF ACTION**

12          **(Fraud – Intentional Misrepresentation and Concealment)**

13   PLAINTIFF LISA AUTHEMENT FOR A FOURTH CAUSE OF ACTION AGAINST

14   DEFENDANTS MIRADRY, INC., SIENTRA, INC., AND DOES 1-100, INCLUSIVE, FOR

15   FRAUD, INTENTIONAL MISREPRESENTATION AND CONCEALMENT ALLEGES:

16          74.    Plaintiff refers to each and every preceding paragraph and incorporates

17   those paragraphs as though set forth in full in this cause of action.

18          75.    Defendants and Does 1-100 actively participated in, agreed to, aided and

19   abetted, conspired in, and/or furthered a fraudulent scheme, as set forth herein, which

20   conduct constitutes fraud and deceit.

21          76.    Defendants' superior knowledge and expertise, their relationship of trust

22   and confidence with clinicians and the public, their specific knowledge regarding the

23   risks and dangers of the MiraDry System and their international dissemination of

24   promotional and marketing information about the MiraDry System for the purpose of

25   maximizing its sale, each give rise to the affirmative duty to meaningfully disclose

26   important material facts concerning the safety and safe use of the MiraDry System,

27   specifically regarding the increased risk of side effects associated with use of the

28

1    MiraDry System at energy level 5, as well as the FDA-approved indications for use of

2    the System.

3         77.    Defendants omitted material information to clinicians and consumers,

4    including clinicians at Eastern Shore Cosmetic Surgery and Plaintiff, as part of a

5    deliberate and intentional effort to induce such persons and entities to rely on the

6    omissions and to allow the MiraDry System to be in and remain in the marketplace for

7    purchase. Through their omissions, Defendants actively conspired to and did conceal

8    the increased risk of side effects associated with the MiraDry System at energy level 5.

9         78.    Defendants omitted material information regarding the increased risks of

10   adverse side effects, including but not limited to ulcers, burns, nerve damage, and

11   infection, associated with use of the MiraDry System at energy level 5, as well as the

12   limited approved indications for use of the MiraDry System, with intent to defraud

13   clinicians and consumers like the clinicians at Eastern Shore Cosmetic Surgery and

14   Plaintiff.

15        79.    Defendants intentionally failed to disclose material facts to clinicians and

16   consumers like the clinicians at Eastern Shore Cosmetic Surgery and Plaintiff that they

17   had a duty to disclose, including the increased risks of adverse side effects associated

18   with use of the MiraDry System at energy level 5, as well as the approved, limited

19   indications for use of the MiraDry System. Each Defendant was aware of and/or

20   approved the material omissions by or on behalf of Defendants.

21        80.    Moreover, Defendants made representations about adverse side effects of

22   the MiraDry System, including but not limited to ulcers, burns, nerve damage, and

23   infection, as well as the approved indications for use of the System, but did not disclose

24   facts which materially qualified the facts disclosed, which rendered their disclosure

25   likely to mislead. The true facts about the increased risks of adverse side effects

26   associated with use of the MiraDry System at energy level 5, as well as the approved

27   indications for use of the System, were known to Defendants, and Defendants knew

28

1    they were not known to or reasonably discoverable by Plaintiff or the clinicians at

2    Eastern Shore Cosmetic Surgery.

3        81.    Defendants knew that their half-truths, concealment and failure to

4    disclose to clinicians at Eastern Shore Cosmetic Surgery and Plaintiff all information

5    reasonably available to them related to the increased risk of adverse side effects at

6    energy level 5 and the approved indications for use of the System, would mislead

7    clinicians at Eastern Shore Cosmetic Surgery by creating the false impression that use of

8    the System at energy level 5 was safe, or as safe as using the System at lower energy

9    levels; and would mislead clinicians at Eastern Shore Cosmetic Surgery as well as

10   Plaintiff by creating the false impression that the MiraDry System was appropriate for,

11   and approved by the FDA for, use on anyone who is bothered by their sweat, as

12   opposed to those suffering from primary axillary hyperhidrosis. Defendants also knew

13   that if clinicians at Eastern Shore Cosmetic Surgery were aware of the increased risks of

14   adverse side effects associated with energy level 5 of the System and the indication for

15   use for primary axillary hyperhidrosis, they would not have used the System at energy

16   level 5 on Plaintiff, or on Plaintiff at all. Moreover, Defendants also knew that if Plaintiff

17   became aware of the increased risks of adverse side effects associated with energy level

18   5 of the System, she would not agree to undergoing the MiraDry procedure at energy

19   level 5, and that if Plaintiff had become aware that the indication for use of the System

20   was for primary axillary hyperhidrosis, she would not agree to undergo the MiraDry

21   procedure.

22       82.    Nevertheless, in willful disregard of Plaintiff's rights and the duties owed

23   to Plaintiff by Defendants, Defendants and Does 1-100, and each of them, concealed and

24   failed to disclose to Plaintiff and clinicians at Eastern Shore Cosmetic Surgery all

25   information reasonably available to them related to the increased risk of adverse side

26   effects associated with use of the System at energy level 5, and the fact that the System

27   was indicated for use to treat primary axillary hyperhidrosis as opposed to treating

28

1     anyone bothered by their sweat, with the express purpose of inducing Plaintiff against

2     her own interest to undergo the MiraDry procedure.

3           83.    Defendants intended the clinicians at Eastern Shore Cosmetic Surgery,

4     and Plaintiff to rely on the Defendants' important material representations and

5     concealment regarding use of the System at energy level 5 and the indications for use of

6     the System.

7           84.    Plaintiff, by and through her own experiences as well as her clinicians',

8     did in fact rely on and was induced by Defendants' misrepresentations, omissions, or

9     active concealment of the dangers of use of the System at energy level 5, as well as the

10     limited indication for use of the System.

11          85.    Plaintiff and her clinicians at Eastern Shore Cosmetic Surgery did not

12     know that the representations made by the Defendants were false and were justified in

13     relying upon Defendants' representations.

14          86.    As the direct and proximate result of Defendants' fraudulent

15     misrepresentations and intentional concealment of facts concerning the increased risk of

16     adverse side effects associated with use of the System at energy level 5, as well as the

17     indication for use of the System, upon which clinicians at Eastern Shore Cosmetic

18     Surgery and Plaintiff reasonably relied, Plaintiff underwent the MiraDry procedure and

19     was treated at an energy level 5, causing her physical pain and mental suffering.

20     Furthermore, Plaintiff was/will be required to undergo additional surgeries and other

21     procedures and incurred medical and pharmaceutical expenses; suffered emotional

22     distress, anxiety, depression and disability; loss of earnings; and loss of quality of life,

23     and all of these injuries are permanent and continuing.

24          87.    Defendants' fraudulent misrepresentations evidenced their callous,

25     reckless, willful, and depraved indifference to the health, safety, and welfare of

26     consumers, including Plaintiff, as well as their goal to place company profits over the

27     safety of hundreds of thousands of consumers, subjecting Defendants to punitive and

28

1  exemplary damages according to the reprehensibility of their conduct and based on the
2  wealth of said Defendants.

3

4  **FIFTH CAUSE OF ACTION**
5  **(Negligent Misrepresentation and Concealment)**
6  PLAINTIFF LISA AUTHEMENT FOR A FIFTH CAUSE OF ACTION AGAINST
7  DEFENDANTS MIRADRY, INC., SIENTRA, INC., AND DOES 1-100, INCLUSIVE, FOR
8  NEGLIGENT MISREPRESENTATION AND CONCEALMENT, ALLEGES:
9      88.    Plaintiff incorporates by reference all preceding paragraphs of this
10  Complaint as if fully set forth herein and further alleges as follows:
11      89.    Defendants' superior knowledge and expertise, their relationship of trust
12  and confidence with clinicians and the public, their specific knowledge regarding the
13  risks and dangers of the MiraDry System and their international dissemination of
14  promotional and marketing information about the MiraDry System for the purpose of
15  maximizing its sale, each give rise to the affirmative duty to meaningfully disclose
16  important material facts concerning the safety and safe use of the MiraDry System,
17  specifically regarding the increased risk of side effects associated with use of the
18  MiraDry System at energy level 5, as well as the FDA-approved indications for use of
19  the System.
20      90.    Defendants made false representations to Plaintiff and/or her clinicians at
21  Eastern Shore Cosmetic Surgery concerning the safety and indications for use of the
22  MiraDry System. Specifically, Defendants negligently, without regard for the truth,
23  misrepresented that use of the MiraDry System at energy level 5 was safe, or as safe as
24  use of the System at lower energy levels, and further negligently misrepresented that
25  the System was appropriate for use on anyone bothered by their sweat. Defendants
26  made those false representations in an effort to mislead clinicians and consumers into
27  purchasing the MiraDry System and/or undergoing treatment with the MiraDry
28  System, so that Defendants could profit. Through their agents, Defendants directly

COMPLAINT AND DEMAND FOR JURY TRIAL

1   communicated these misrepresentations to Plaintiff and/or her clinicians at Eastern

2   Shore Cosmetic Surgery, who were Plaintiff's fiduciaries.

3        91.    Defendants omitted, suppressed, and concealed material facts concerning

4   the heightened dangers and heightened risks of adverse side effects associated with use

5   of the MiraDry System at energy level 5. Defendants also ignored, downplayed,

6   avoided, or otherwise understated the serious nature of the risks associated with use of

7   the MiraDry System at energy level 5 in order to increase sales.

8        92.    Defendants intended the clinicians at Eastern Shore Cosmetic Surgery,

9   and Plaintiff to rely on the Defendants' important material representations and

10   concealment regarding use of the System at energy level 5 and the indications for use of

11   the System.

12        93.    Plaintiff and her clinicians did in fact rely on and were induced by

13   Defendants' misrepresentations, omissions, or active concealment of the dangers of use

14   of the System at energy level 5, as well as the limited indication for use of the System.

15        94.    Plaintiff and her clinicians at Eastern Shore Cosmetic Surgery did not

16   know that the representations made by the Defendants were false and were justified in

17   relying upon Defendants' representations.

18        95.    Had the clinicians at Eastern Shore Cosmetic Surgery been aware of the

19   increased risks of adverse side effects associated with energy level 5 of the System and

20   the indication for use for primary axillary hyperhidrosis, they would not have used the

21   System at energy level 5 on Plaintiff, or on Plaintiff at all. Moreover, had Plaintiff

22   became aware of the increased risks of adverse side effects associated with energy

23   5 of the System, she would not agree to undergoing the MiraDry procedure at energy

24   level 5, and had Plaintiff become aware that the indication for use of the System was for

25   primary axillary hyperhidrosis, she would not agree to undergo the MiraDry

26   procedure.

27        96.    As the direct and proximate result of Defendants' fraudulent

28

1  misrepresentations and intentional concealment of facts concerning the increased risk of

2  adverse side effects associated with use of the System at energy level 5, as well as the

3  indication for use of the System, upon which clinicians at Eastern Shore Cosmetic

4  Surgery and Plaintiff reasonably relied, Plaintiff underwent the MiraDry procedure and

5  was treated at an energy level 5, causing her physical pain and mental suffering.

6  Furthermore, Plaintiff was/will be required to undergo additional surgeries and other

7  procedures and incurred medical and pharmaceutical expenses; suffered emotional

8  distress, anxiety, depression and disability; loss of earnings; and loss of quality of life,

9  and all of these injuries are permanent and continuing.

10

11              **PUNITIVE DAMAGE ALLEGATIONS**

12              **(Brought by Plaintiff Against Defendants**

13              **MiraDry, Inc. and Sientra, Inc. and Does 51-100)**

14      97.    Plaintiff incorporates by reference all preceding paragraphs of this

15  Complaint as if fully set forth herein and further alleges as follows:

16      98.    The acts, conduct, and omissions of Defendants, and each of them, as

17  alleged throughout this Complaint were willful and malicious and were done with a

18  conscious disregard for the rights of Plaintiff as a user of Defendants' MiraDry System

19  and for the primary purpose of increasing Defendants' profits from the sale and

20  distribution of the MiraDry System. Defendants' outrageous and unconscionable

21  conduct warrants an award of exemplary and punitive damages against each Defendant

22  in an amount appropriate to punish and make an example of each Defendant.

23      99.    Prior to the manufacturing, sale, and distribution of the MiraDry System,

24  Defendants, and each of them, knew that use of the MiraDry System at energy level 5

25  significantly increased the risk of adverse side effects to patients, including but not

26  limited to ulcers, burns, nerve damage, and infection. In fact, MiraDry's longstanding

27  recommended protocol was to use the System at low energy levels (levels 1-3) over two

28

1    separate treatments. However, these recommendations and safety precautions would

2    soon be disregarded in the interest of profit.

3          100.    Starting in or about 2015, Defendants, and each of them, acting through

4    their officers, directors and managing agents for the purpose of enhancing Defendants'

5    profits—including the then-Vice President of Marketing at MiraDry, Robert Ellis—

6    knowingly and deliberately trained, suggested, instructed, and/or recommended that

7    clinicians operate the MiraDry System at energy level 5 on patients *consistently*, in an

8    effort to reduce treatment times and boost sales, all at the expense of patient health and

9    safety. Said Defendants and their individual agents, officers, and directors intentionally

10   proceeded with recommending that clinicians operate the System at energy level 5 on

11   patients, knowing persons would be exposed to serious danger in order to advance

12   Defendants' own pecuniary interests and monetary profits.

13         101.    Defendants' conduct was despicable, and so contemptible that it would be

14   looked down upon and despised by ordinary decent people, and was carried on by

15   Defendants with willful and conscious disregard for the safety of Plaintiff, entitling

16   Plaintiff to exemplary damages.

17

18                                    **PRAYER**

19         **WHEREFORE**, Plaintiff Lisa Authement prays for judgment against Defendants

20   and Does 1-100, inclusive, on each of the above-referenced claims and Causes of Action

21   and as follows:

22         1.  For general damages including damages for pain and suffering and mental

23             and emotional distress, in an amount to be determined at the time of trial;

24         2.  For special damages including damages for loss of earnings and past and

25             future medical care, in an amount to be determined at the time of trial;

26         3.  For punitive damages as to Defendants MiraDry, Inc. and Sientra, Inc. and

27             Does 51-100, for the oppressive, malicious or fraudulent conduct of

28

1    Defendants MiraDry, Inc. and Sientra, Inc. and Does 51-100, in an amount to

2    be determined at trial;

3    4.  For prejudgment interest to the extent permitted by law;

4    5.  For costs of suit herein incurred; and

5    6.  For such other and further relief as the Court may deem just and proper.

6

7    Dated: September 16, 2021                    BENTLEY & MORE LLP

8

9    By: _____

10                                                    GREGORY L. BENTLEY

11                                                    FARNAZ SALESSI

12                                                    Attorneys for Plaintiff

13    Dated: September 16, 2021                    ESTES LAW FIRM, LLC

14

15    By: _____

16                                                    CHRISTOPHER ESTES

17                                                    Attorney for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

1                             **JURY DEMAND**

2            Plaintiff hereby demands a jury trial on all causes of action that are triable to a

3   jury.

4

5   Dated:  September 16, 2021          BENTLEY & MORE LLP

6

7                             By: _____

8                               GREGORY L. BENTLEY

9                               FARNAZ SALESSI

10                              Attorneys for Plaintiff

11   Dated: September 16, 2021          ESTES LAW FIRM, LLC

12

13                             By: _____

14                               CHRISTOPHER ESTES

15                               Attorney for Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

Miramar Labs, Inc                                                    miraDry System

$K103014$

## 510(k) Summary

General Information                                              JAN 2 8 2011

Trade Name            miraDry System

Classification        21CFR 878.4400, Electrosurgical cutting and
                      coagulation device and accessories
                      Class II (special controls)

Product Code          NEY

Submitter             Miramar Labs, Inc.
                      445 Indio Way
                      Sunnyvale, CA 94085
                      USA
                      Tel:   408-940-8700
                      Fax:   408-940-8795

Contact               Kathy O'Shaughnessy, PhD
                      VP, Clinical and Regulatory Affairs

Date prepared:        January 20, 2011

Indications for Use

The miraDry System is indicated for use in the treatment of primary axillary
hyperhidrosis.

Note: The miraDry System is not indicated for treating hyperhidrosis related to
other body areas or generalized hyperhidrosis.

Predicate Device

K082819            Miramar Labs' DTS G2 System

Device Description

The miraDry System is a microwave device designed to heat tissue located at
the dermal- hypodermal interface where the sweat glands reside using a
surface contact applicator. The miraDry System consists of: the DTS3000

Miramar Labs, Inc                          K103014                          miraDry System

Console; the miraDry Handpiece; and a disposable, sterile miraDry bioTip that snaps onto the Handpiece to provide a sterile protective cover.

The DTS3000 Console is a software-driven device which contains circuit boards, a microwave generator, integrated vacuum and cooling systems, and an integrated touch-screen user interface.

The non-invasive miraDry Handpiece is specifically designed to deliver microwave energy to the skin at specified frequency and power levels. The proximal end of the Handpiece has a cable bundle and console connector that supplies the energy and cooling to the Handpiece. The distal end has a sterile, disposable barrier, the miraDry bioTip, that contacts the patient.

## Materials

All materials used in the manufacture of the miraDry System are suitable for this use and have been used in numerous previously cleared products. Patient-contacting materials have been demonstrated to be biocompatible.

## Performance Testing

Product and animal testing was conducted to ensure conformance to product specifications, and equivalence to the predicate device. In particular, animal testing demonstrated that thermal zones created with the predicate device were similar to those created with the miraDry System.

The miraDry System has been shown to conform to the applicable requirements of the following:

- IEC 60601-1: (1988 + A1:1991 + A2:1995) Medical Electrical Equipment Part 1: General Requirements for Safety: Safety Requirements for Medical Electrical Systems
- IEC 60601-1-2: (2001+A1:2004) Medical Electrical Equipment Part 1-2: General Requirements for Safety: Electromagnetic Compatibility
- IEC60601-1-4:2000. Medical Electrical Equipment Part 1-4 General requirement for safety - Collateral Standard: Programmable electrical medical systems
- IEC60601-1-6:2004. Medical electrical equipment Part 1-6: General requirements for safety – Collateral Standard: Usability
- IEC 60601-2-2:2006. Medical electrical equipment Part 2-2: Particular requirements for the safety of High Frequency Surgical Equipment
- IEC 60601-2-6:1984. Medical electrical equipment Part 2: Particular requirements for the safety of microwave therapy equipment.

Clinical testing showed that the device provides a safe and effective means to treat axillary hyperhidrosis. A randomized, blinded study with 120 subjects with primary axillary hyperhidrosis was conducted. The study primary endpoint was met, which demonstrated a statistically significant difference in sweat

Miramar Labs, Inc                    $K_{1}03014$                    miraDry System

reduction efficacy between the treated subjects (n=81) and the subjects that received a sham treatment (n=39). Adverse events were generally mild in severity and all but one (persistent hyperhidrosis on the face) resolved.

Summary of Substantial Equivalence

The miraDry System is substantially equivalent to the predicate product for the following reasons:

1. The miraDry System has the same intended use as the legally marketed DTS G2 System, i.e., a localized and controlled heating of soft tissue.
2. The indication for use for the miraDry System is a specific indications for use within the "functional" indications for use for the DTS G2 System that were cleared by FDA, i.e., "The DTS G2 System is indicated for use for coagulation of soft tissue".
3. The materials used in the miraDry System, the device's methods of manufacturing and overall function are the same as the FDA cleared DTS G2 System.
4. While the miraDry System has the same intended use and basic technological characteristics as the predicate, the specificity of the miraDry System's indications for use prompted Miramar Labs to conduct a clinical study to ensure that the performance specifications of the device met user needs. On the basis of direct comparison with the predicate device and the results of preclinical and clinical testing, the miraDry System has been demonstrated to be substantially equivalent to the legally marketed DTS G2 System.

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Room –WO66-G609
Silver Spring, MD 20993-0002

Miramar Labs, Inc.
% Kathy O'Shaughnessy, Ph.D.
Vice President, Clinical and Regulatory Affairs
445 Indio Way                                          JAN 2 8 2011
Sunnyvale, California 94085

Re: K103014
    Trade/Device Name: miraDry System
    Regulation Number: 21 CFR 878.4400
    Regulation Name: Electrosurgical cutting and coagulation device and accessories
    Regulatory Class: Class II
    Product Code: OUB, NEY
    Dated: December 10, 2010
    Received: December 13, 2010

Dear Dr. O'Shaughnessy:

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA).
You may, therefore, market the device, subject to the general controls provisions of the Act. The
general controls provisions of the Act include requirements for annual registration, listing of
devices, good manufacturing practice, labeling, and prohibitions against misbranding and
adulteration. Please note: CDRH does not evaluate information related to contract liability
warranties. We remind you; however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it
may be subject to additional controls. Existing major regulations affecting your device can be
found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may
publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean
that FDA has made a determination that your device complies with other requirements of the Act

Page 2 – Kathy O'Shaughnessy, Ph.D.

or any Federal statutes and regulations administered by other Federal agencies. You must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please go to http://vvww.fda.gov/AboutFDA/CentersOffices/CDRH/CDRHOffices/ucm115809.htm for the Center for Devices and Radiological Health's (CDRH's) Office of Compliance. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://vvww.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Small Manufacturers, International and Consumer Assistance at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely yours,

Mark N. Melkerson
Director
Division of Surgical, Orthopedic
 And Restorative Devices
Office of Device Evaluation
Center for Devices and
 Radiological Health

Enclosure

*K 103014*

# 1   Indications for Use

510(k) Number (if known):

Device Name:                        miraDry System

Indications for Use:              The miraDry System is indicated for use in the
                                          treatment of primary axillary hyperhidrosis.

                                          Note: The miraDry System is not indicated for use
                                          in the treatment of hyperhidrosis related to other
                                          body areas or generalized hyperhidrosis.

| _____X_____ | OR | _____ |
|---|---|---|
| Prescription Use | | Over-The-Counter Use |
| (Per 21 CFR 801 Subpart D) | | (21 CFR 801 Subpart C) |

PLEASE DO NOT WRITE BELOW THIS LINE - CONTINUE ON ANOTHER PAGE
IF NEEDED)

_____

Concurrence of CDRH, Office of Device Evaluation (ODE)

Neil R.P. Ogden  for MXM

(Division Sign-Off)
Division of Surgical, Orthopedic,
and Restorative Devices

510(k) Number___K 103014___

## 2. 510(k) Summary

General Information

| | |
|---|---|
| Classification: | Class II (special controls) |
| Classification No.: | 21 CFR 878.4400 |
| Common Name: | Electrosurgical cutting and coagulation device and accessories. |
| Product Code(s): | OUB, NEY |
| Trade Name: | miraDry System |
| Submitter: | Miramar Labs, Inc.   *OCT 2 5 2013* <br> 445 Indio Way <br> Sunnyvale, CA 94085 <br> USA <br> Tel: 408-940-8700 <br> Fax: 408-940-8795 |
| | FDA Registration No.: 3008082710 |
| Contact: | Kathy O'Shaughnessy, PhD <br> VP, Clinical/Regulatory/Quality |
| Date prepared: | 10/8/2013 |

### Intended Use

The miraDry System bears the following Indications for Use statement that is identical to the FDA authorized indications for use for the predicate.

> The miraDry System is indicated for use in the treatment of primary axillary hyperhidrosis.

> Note: The miraDry System is not indicated for use in the treatment of hyperhidrosis related to other body areas or generalized hyperhidrosis.

### Predicate Device

miraDry System – K103014
Cleared: January 28, 2011

## Device Description

The miraDry System is a microwave device designed to heat tissue located at the dermal- hypodermal interface where the axillary sweat glands reside using a surface contact applicator.  The miraDry System consists of: the MD4000-MC Console; the MD4000-HP miraDry Handpiece; and a disposable, sterile MD4000-BT miraDry bioTip that snaps onto the Handpiece to provide a sterile protective cover.

As described in K103014, the miraDry System also includes Class I components/accessories.  The MD4000-TS template system is a required component for the miraDry treatment as well as the MD4000-PK priming kit.  The MD4000-PK priming kit is required when the system is initially set up at a user facility. Optional accessories include an Armrest and disposable ice packs.

The MD4000-MC Console is a software-driven device which contains circuit boards, a microwave generator, integrated vacuum and cooling systems, and an integrated touch-screen user interface.

The non-invasive miraDry Handpiece is specifically designed to deliver microwave energy to the skin at specified frequency and power levels.  The proximal end of the Handpiece has a cable bundle and a console connector that supplies the energy and cooling to the Handpiece.  The distal end has a sterile, disposable barrier, the miraDry bioTip, which contacts the patient.

The technological characteristics and the principles of operation for the MD4000 miraDry System are the same as the predicate miraDry System.

## Materials

All materials used in the manufacture of the modified miraDry System have been demonstrated to meet strict design requirements, including requirements for durability and biocompatibility, and are therefore suitable for use under the anticipated conditions of use associated with the device.  There are no changes in materials that raise questions of safety or effectiveness.

## Testing

Based on the risk assessment of the modifications, bench testing and pre-clinical testing were performed to ensure continued conformance to all product specifications, and equivalence to the predicate device.

The miraDry System has been shown to conform to the applicable requirements of the following:

- IEC 60601-1:2005 + A1:2012 Medical Electrical Equipment Part 1: General Requirements for Safety: Safety Requirements for Medical Electrical Systems
- IEC 60601-1-2:2007 Medical Electrical Equipment Part 1-2: General Requirements for Safety: Electromagnetic Compatibility
- IEC 60601-1-6:2010 Medical electrical equipment Part 1-6: General requirements for safety – Collateral Standard: Usability .
- IEC 60601-2-6:2012 Medical electrical equipment Part 2-6: Particular requirements for the safety of microwave therapy equipment.

## Summary of Substantial Equivalence

The MD4000 miraDry System is substantially equivalent to the predicate device, the miraDry System cleared under K103014. The indications for use and technological characteristics are equivalent; therefore, the miraDry System is substantially equivalent to the predicate device.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center – WO66-G609
Silver Spring, MD 20993-0002

Miramar Labs, Incorporated                    October 25, 2013
Ms. Kathy O'Shaughnessy
Vice President, Clinical/Regulatory/Quality
445 Indio Way
Sunnyvale, California 94085

Re: K131162
     Trade/Device Name:  miraDry System
     Regulation Number:  21 CFR 878.4400
     Regulation Name:  Electrosurgical cutting and coagulation device and accessories
     Regulatory Class:  Class II
     Product Code:  OUB, NEY
     Dated:  October 8, 2013
     Received:  October 9, 2013

Dear Ms. O'Shaughnessy:

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA).
You may, therefore, market the device, subject to the general controls provisions of the Act. The
general controls provisions of the Act include requirements for annual registration, listing of
devices, good manufacturing practice, labeling, and prohibitions against misbranding and
adulteration. Please note: CDRH does not evaluate information related to contract liability
warranties. We remind you; however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it
may be subject to additional controls. Existing major regulations affecting your device can be
found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may
publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean
that FDA has made a determination that your device complies with other requirements of the Act
or any Federal statutes and regulations administered by other Federal agencies. You must
comply with all the Act's requirements, including, but not limited to: registration and listing (21
CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical
device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set

Page 2 – Ms. Kathy O'Shaughnessy

forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please contact the Division of Small Manufacturers, International and Consumer Assistance at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Small Manufacturers, International and Consumer Assistance at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely yours,

Mark N. Melkerson -S

Mark N. Melkerson
Acting Director
Division of Surgical Devices
Office of Device Evaluation
Center for Devices and
   Radiological Health

Enclosure

## 1. Indications for Use Statement

---

**510(k) Number:**
(if known)

K131162

**Device Name:**

miraDry System

**Indications for Use:**

The miraDry System is indicated for use in the treatment of primary axillary hyperhidrosis.

Note: The miraDry System is not indicated for use in the treatment of hyperhidrosis related to other body areas or generalized hyperhidrosis.

---

| X | AND/OR | |
|---|---|---|
| Prescription Use | | Over-The-Counter Use |
| (Per 21 CFR 801 Subpart D) | | (21 CFR 801 Subpart C) |

### PLEASE DO NOT WRITE BELOW THIS LINE – CONTINUE ON ANOTHER PAGE IF NEEDED

---

Concurrence of CDRH, Office of Device Evaluation (ODE)

Long H. Chen -A  *Digitally signed by Long H. Chen -A*
*DN: c=US, o=U.S. Government, ou=HHS,*
*ou=FDA, ou=People, cn=Long H. Chen -A,*
*0.9.2342.19200300.100.1.1=1300369056*
*Date 2013.10.23 09:26:28 -04'00'*

_____    for MXM

(Division Sign-off)
Division of Surgical Devices
510(k) Number: K131162



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center – WO66-G609
Silver Spring, MD  20993-0002

June 19, 2015

Miramar Labs Incorporated
Dr. Kathy O'Shaughnessy, Ph.D.
Vice President, Clinical/Regulatory/Quality Assurance
2790 Walsh Avenue
Santa Clara, California 95051

Re:  K150419
      Trade/Device Name:  MiraDry System MD4000
      Regulation Number:  21 CFR 878.4400
      Regulation Name:  Electrosurgical Cutting and Coagulation Device and Accessories
      Regulatory Class:  Class II
      Product Code:  OUB, NEY, MWY
      Dated:  May 5, 2015
      Received:  May 6, 2015

Dear Dr. O'Shaughnessy:

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA).
You may, therefore, market the device, subject to the general controls provisions of the Act.  The
general controls provisions of the Act include requirements for annual registration, listing of
devices, good manufacturing practice, labeling, and prohibitions against misbranding and
adulteration.  Please note: CDRH does not evaluate information related to contract liability
warranties. We remind you; however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA),
it may be subject to additional controls.  Existing major regulations affecting your device can be
found in the Code of Federal Regulations, Title 21, Parts 800 to 898.  In addition, FDA may
publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean
that FDA has made a determination that your device complies with other requirements of the Act
or any Federal statutes and regulations administered by other Federal agencies.  You must
comply with all the Act's requirements, including, but not limited to: registration and listing (21
CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical
device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set

Page 2 – Ms. Kathy O'Shaughnessy, Ph.D.

forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please contact the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.  Also, please note the regulation entitled, ″Misbranding by reference to premarket notification″ (21CFR Part 807.97).  For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely yours,

Jennifer R. Stevenson -S

For Binita S. Ashar, M.D., M.B.A., F.A.C.S.
    Director
    Division of Surgical Devices
    Office of Device Evaluation
    Center for Devices and
        Radiological Health

Enclosure

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Food and Drug Administration

**Indications for Use**

Form Approved: OMB No. 0910-0120
Expiration Date: January 31, 2017
*See PRA Statement below.*

510(k) Number *(if known)*
K150419

Device Name
miraDry System MD4000

Indications for Use *(Describe)*
The miraDry System MD4000 is indicated for use in the treatment of primary axillary hyperhidrosis plus unwanted underarm hair removal, and permanent reduction of underarm hair of all colors for Fitzpatrick skin types I – IV.

Permanent hair reduction is defined as long-term, stable reduction in the number of hairs regrowing when measured at 6, 9 and 12 months after the completion of a treatment regime.

Type of Use *(Select one or both, as applicable)*

☒ Prescription Use (Part 21 CFR 801 Subpart D)      ☐ Over-The-Counter Use (21 CFR 801 Subpart C)

**CONTINUE ON A SEPARATE PAGE IF NEEDED.**

This section applies only to requirements of the Paperwork Reduction Act of 1995.

**\*DO NOT SEND YOUR COMPLETED FORM TO THE PRA STAFF EMAIL ADDRESS BELOW.\***

The burden time for this collection of information is estimated to average 79 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden, to:

Department of Health and Human Services
Food and Drug Administration
Office of Chief Information Officer
Paperwork Reduction Act (PRA) Staff
*PRAStaff@fda.hhs.gov*

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

**FORM FDA 3881 (8/14)**       Page 1 of 1

**Traditional 510(k) – miraDry System MD4000 (K150419)**

## 5. 510(k) Summary

### GENERAL INFORMATION

| | |
|---|---|
| **Classification:** | Class II (special controls) |
| **Classification No.:** | 21 CFR 878.4400 |
| **Classification Name:** | Electrosurgical cutting and coagulation device and accessories. |
| **Product Code(s):** | OUB, NEY, MWY |
| **Common Name:** | Instrument for Treatment of Hyperhidrosis |
| | System, Ablation, Microwave And Accessories |
| | System, Microwave, Hair Removal |
| **Trade Name:** | miraDry System MD4000 |
| **Submitter:** | Miramar Labs, Inc. |
| | 2790 Walsh Avenue |
| | Santa Clara, CA 95051 |
| | USA |
| | Tel:  408-940-8700 |
| | Fax:  408-940-8795 |
| | |
| | FDA Registration No.: 3008082710 |
| **Contact:** | Kathy O'Shaughnessy, PhD |
| | VP, Clinical/Regulatory/Quality |
| **Date prepared:** | 06/16/15 |

### INTENDED USE

The miraDry System MD4000 is indicated for use in the treatment of primary axillary hyperhidrosis plus unwanted underarm hair removal, and permanent reduction of underarm hair of all colors for Fitzpatrick skin types I – IV.

Permanent hair reduction is defined as long-term, stable reduction in the number of hairs regrowing when measured at 6, 9 and 12 months after the completion of a treatment regime.

## PREDICATE DEVICES

The miraDry System MD4000 (K131162).

## REFERENCE DEVICE

The Microwave Delivery System Model MMC-330 (K991456).

## DEVICE DESCRIPTION

The miraDry System MD4000 is a microwave device designed to heat tissue located at the dermal- hypodermal interface where the axillary sweat glands and hair bulbs reside using a surface contact applicator.  The miraDry System MD4000 consists of: the MD4000-MC Console; the MD4000-HP miraDry Handpiece; and a disposable, sterile MD4000-BT miraDry bioTip that snaps onto the Handpiece to provide a sterile protective cover.

As described in K131162, the miraDry System MD4000 also includes Class I components/accessories.  The MD4000-TS template system is a required component for the miraDry treatment as well as the MD4000-PK priming kit.  The MD4000-PK priming kit is required when the system is initially set up at a user facility. Optional accessories include an armrest and disposable ice packs.

The MD4000-MC Console is a software-driven device which contains circuit boards, a microwave generator, integrated vacuum and cooling systems, and an integrated touch-screen user interface.

The non-invasive miraDry Handpiece is specifically designed to deliver microwave energy to the skin at specified frequency and power levels.  The proximal end of the Handpiece has a cable bundle and a console connector that supplies the energy and cooling to the Handpiece.  The distal end has a sterile, disposable barrier, the miraDry bioTip, which contacts the patient.

## SUMMARY OF SUBSTANTIAL EQUIVALENCE

The miraDry System MD4000 with the revised, expanded indication to include underarm hair removal is substantially equivalent to the miraDry System MD4000 as previously cleared for sweat reduction. The subject and predicate device have the same fundamental technology, design, and method of usage. A comparison of the two devices is shown in Table 1 below.

**Traditional 510(k) – miraDry System MD4000 (K150419)**

Table 1. Substantial Equivalence Comparison Table.

| Characteristics | Predicate Device miraDry MD4000 | Subject Device miraDry MD4000 |
|---|---|---|
| **510(k)** | K131162 | K150419 |
| **Device Class** | II | II |
| **Energy Type** | Microwave | Microwave |
| **Mode of Action** | generation of localized heat | generation of localized heat |
| **Product Code** | NEY, OUB | NEY, OUB, MWY |
| **Indications for Use** | The miraDry System is indicated for use in the treatment of primary axillary hyperhidrosis.<br><br>Note: The miraDry System is not indicated for use in the treatment of hyperhidrosis related to other body areas or generalized hyperhidrosis. | The miraDry System MD4000 is indicated for use in the treatment of primary axillary hyperhidrosis plus unwanted underarm hair removal, and permanent reduction of underarm hair of all colors for Fitzpatrick skin types I – IV.<br>Permanent hair reduction is defined as long-term, stable reduction in the number of hairs regrowing when measured at 6, 9 and 12 months after the completion of a treatment regime. |
| **Function** | Heat absorption by tissue located at the dermal- hypodermal interface where the axillary sweat glands reside | Heat absorption by tissue located at the dermal- hypodermal interface where the axillary sweat glands and hair bulbs reside |
| **Overall System structure** | microwave source/amplifier, coolant supply system, operator interface, and microwave, electrical and coolant lines that connect to the applicator | microwave source/amplifier, coolant supply system, operator interface, and microwave, electrical and coolant lines that connect to the applicator |
| **Key Components** | Console, handpiece, disposable applicator tip | Console, handpiece, disposable applicator tip |
| **Console Control Mechanism** | electronic user interface | electronic user interface |
| **Coolant usage** | Delivers cooling to the skin surface | Delivers cooling to the skin surface |

<u>NON-CLINICAL TESTING</u>

There was no additional non-clinical testing that was completed, as the device being used is the same as the cleared device (miraDry System MD4000, cleared under K131162).

**Traditional 510(k) – miraDry System MD4000 (K150419)**

CLINICAL TESTING

The safety and effectiveness of the clinical application of the miraDry System MD4000 for sweat reduction was demonstrated in prior clinical studies. The performance for underarm hair reduction was demonstrated in a clinical trial of 56 subjects.

The primary objective of this study was to quantify hair reduction in the axillae after treatment(s) with the miraDry System MD4000.  The study device was used in the same manner as the commercially available technique cleared by the FDA for the treatment of primary axillary hyperhidrosis, as described in the User Manual.

The study was conducted at three private dermatology clinics in the United States.  The study was initiated at the first site in September of 2012. Adult subjects seeking hair reduction in the axillae were considered for enrollment. Subjects were treated with the miraDry System MD4000 using the standard miraDry procedure in one or two treatment sessions 3 months apart.

Fifty-six subjects were enrolled in the study.  The mean age was 33 years; 80% of the subjects were female and 88% were Caucasian.  The majority of the subjects were of Fitzpatrick skin type I-IV.   23% (13/56) of the subjects completed only one treatment session; 5 of these 13 subjects declined a second session due to adverse events. The primary endpoint of this study was to show >30% reduction (baseline to 3 month, measured by hair counts) in >50% of subjects. There were 42 subjects assessable for this endpoint.  The secondary endpoint was to show >30% reduction (comparing baseline to 12 months photos) to make a claim for permanent axillary hair reduction.  Additional analyses used a blinded comparison of baseline to follow-up full-axilla photos by an independent physician reviewer to correctly identify which photo had more hair and score hair reduction at follow-up.  Also, a subject assessment of overall satisfaction, odor rating and sweat ratings was determined at the follow-up visits.  A summary of the results is presented in Table 2 below.

**Traditional 510(k) – miraDry System MD4000 (K150419)**

Table 2: Summary of Efficacy Results.

| Efficacy measure | Follow-up visit time from the last treatment session | | | |
|---|---|---|---|---|
| | 3 months | 6 month | 9 month | 12 month |
| Hair count:<br>% of subjects with >30% reduction [lower 95% CL] | **Primary:**<br>88.1% (37/42)<br>[76.6%] | 97.5% (39/40)<br>[88.7%] | 92.1% (35/38)<br>[80.8%] | **Secondary:**<br>95.5% (42/44)<br>[86.4%] |
| Hair count:<br>Average reduction [std]<br>Light hair subgroup (n) | 66% [± 30%]<br>66% (n=12) | 72% [± 29%] | 75% [± 28%] | 75% [± 27%]<br>72% (n=13) |
| Side-by-side axilla review:<br>% of pairs having at least 26-50% reduction | 74% (63/85) | 78% (65/83) | 78% (66/85) | 89% (83/93) |
| Patient satisfaction with hair reduction: % of subjects rating "very satisfied" or "somewhat satisfied" | 81%<br>(38/47) | 70%<br>(31/44) | 68%<br>(30/44) | 70%<br>(33/47) |
| Odor self-assessment, Mean reduction 10pt scale | 2.6 ± 3.0 | 2.8 ± 2.8 | 2.5 ± 2.8 | 2.4 ± 2.7 |
| % of subjects with HDSS reduction to score of 1 or 2 | 92%<br>(23/25) | 96%<br>(25/26) | 96%<br>(24/25) | 89%<br>(25/28) |

Both the primary and secondary endpoints were met, since the percentage of patients with hair reduction of at least 30% was significantly higher than 50% at all follow-up timepoints.

All subjects experienced at least one (1) treatment-related adverse event (AE), 99% (324/326) of all AE's were rated as mild in severity. Many subjects experienced the expected mild transient post-treatment effects; the most common were localized edema (55%), tingling or numbness in the treatment area (30%), vacuum acquisition marks (29%), bumps or lumps under the skin (29%) or discomfort or tenderness in the treatment area (26%). Other rarer treatment effects affecting more than the treatment area were noted in 18% of subjects (10/56), 75% of which were rated as mild. These included numbness or tingling in the arms (n=6 events); more extensive swelling in the adjacent area (e.g. arms) (n=4 events); and bruising outside the treatment area (n=2 events). One patient experienced unilateral ulnar neuropathy that was improving but not completely resolved at study exit. The types, rates and severity of the reported AE's are substantially equivalent to those from the predicate device (MD4000-MC with the hyperhidrosis indication, K131162).

The modification to the Indications for Use statement has not altered the fundamental technology of the miraDry System MD4000.

**Traditional 510(k) – miraDry System MD4000 (K150419)**

## CONCLUSION

As described in this 510(k) Summary, Miramar Labs Inc. considers the miraDry System MD4000 to be substantially equivalent to the predicate device.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center - WO66-G609
Silver Spring, MD 20993-0002

October 31, 2016

Miramar Labs Incorporated
Ms. Kathy O'Shaughnessy
Consultant, Regulatory Affairs
2790 Walsh Avenue
Santa Clara, California 95051

Re: K160141
   Trade/Device Name: miraDry System
   Regulation Number: 21 CFR 878.4400
   Regulation Name: Electrosurgical Cutting and Coagulation Device and Accessories
   Regulatory Class: Class II
   Product Code: OUB, NEY, MWY
   Dated: September 19, 2016
   Received: September 20, 2016

Dear Ms. O'Shaughnessy:

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA).
You may, therefore, market the device, subject to the general controls provisions of the Act. The
general controls provisions of the Act include requirements for annual registration, listing of
devices, good manufacturing practice, labeling, and prohibitions against misbranding and
adulteration. Please note: CDRH does not evaluate information related to contract liability
warranties. We remind you, however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA),
it may be subject to additional controls. Existing major regulations affecting your device can be
found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may
publish further announcements concerning your device in the <u>Federal Register</u>.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean
that FDA has made a determination that your device complies with other requirements of the Act
or any Federal statutes and regulations administered by other Federal agencies. You must comply
with all the Act's requirements, including, but not limited to: registration and listing (21 CFR
Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-
related adverse events) (21 CFR 803); good manufacturing practice requirements as set forth in
the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product
radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

Page 2 - Ms. Kathy O'Shaughnessy

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please contact the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address
http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to
http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address
http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely,

Jennifer R. Stevenson -A

For Binita S. Ashar, M.D., M.B.A., F.A.C.S.
   Director
   Division of Surgical Devices
   Office of Device Evaluation
   Center for Devices and
      Radiological Health

Enclosure

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Food and Drug Administration

**Indications for Use**

Form Approved: OMB No. 0910-0120
Expiration Date: January 31, 2017
*See PRA Statement below.*

510(k) Number *(if known)*
K160141

Device Name
miraDry System

Indications for Use *(Describe)*
The miraDry System MD4000 is indicated for use in the treatment of primary axillary hyperhidrosis plus unwanted underarm hair removal, and permanent reduction of underarm hair of all colors for Fitzpatrick skin types I – IV.

Permanent hair reduction is defined as long-term, stable reduction in the number of hairs regrowing when measured at 6, 9 and 12 months after the completion of a treatment regime.

When used for the treatment of primary axillary hyperhidrosis, the miraDry System MD4000 may reduce underarm odor.

Type of Use *(Select one or both, as applicable)*

☒ Prescription Use (Part 21 CFR 801 Subpart D)      ☐ Over-The-Counter Use (21 CFR 801 Subpart C)

**CONTINUE ON A SEPARATE PAGE IF NEEDED.**

This section applies only to requirements of the Paperwork Reduction Act of 1995.

**\*DO NOT SEND YOUR COMPLETED FORM TO THE PRA STAFF EMAIL ADDRESS BELOW.\***

The burden time for this collection of information is estimated to average 79 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden, to:

Department of Health and Human Services
Food and Drug Administration
Office of Chief Information Officer
Paperwork Reduction Act (PRA) Staff
*PRAStaff@fda.hhs.gov*

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

# 1. 510(k) Summary

## GENERAL INFORMATION

| | |
|---|---|
| **Classification:** | Class II (special controls) |
| **Classification No.:** | 21 CFR 878.4400 |
| **Classification Name:** | Electrosurgical cutting and coagulation device and accessories. |
| **Product Code(s):** | OUB, NEY, MWY |
| **Common Name:** | Instrument for Treatment of Hyperhidrosis |
| | System, Ablation, Microwave And Accessories |
| | System, Microwave, Hair Removal |
| **Trade Name:** | miraDry MD4000 System |
| **Submitter:** | Miramar Labs, Inc. 2790 Walsh Avenue Santa Clara, CA 95051, USA Tel: 408-940-8700 Fax: 408-940-8795 |
| | FDA Registration No.: 3008082710 |
| **Contact:** | Kathy O'Shaughnessy, PhD VP, Clinical/Regulatory/QA (Consulting) |
| **Date prepared:** | 10/27/16 |

## INDICATIONS FOR USE

The miraDry System MD4000 is indicated for use in the treatment of primary axillary hyperhidrosis plus unwanted underarm hair removal, and permanent reduction of underarm hair of all colors for Fitzpatrick skin types I – IV.

Permanent hair reduction is defined as long-term, stable reduction in the number of hairs regrowing when measured at 6, 9 and 12 months after the completion of a treatment regime.

When used for the treatment of primary axillary hyperhidrosis, the miraDry System MD4000 may reduce underarm odor.

**PREDICATE DEVICE**

The miraDry MD4000 System (K150419).

**DEVICE DESCRIPTION**

The miraDry MD4000 that is the subject of this 510(k) is identical to the device described and cleared in K150419, except for the proposed labeling changes that resulted in this 510(k) submission.

The miraDry MD4000 System is a microwave device designed to heat tissue located at the dermal- hypodermal interface where the axillary sweat and odor glands and hair bulbs reside using a surface contact applicator. The miraDry MD4000 System consists of: the MD4000-MC Console; the MD4000-HP miraDry Handpiece; and a disposable, sterile MD4000-BT miraDry bioTip that snaps onto the Handpiece to provide a sterile protective cover.

As described in K150419 and prior submissions, the miraDry MD4000 System also includes Class I components/accessories. The MD4000-TS template system is a required component for the miraDry treatment as well as the MD4000-PK priming kit and the MD4000-BT-DE demonstration bioTip. The MD4000-PK priming kit and the non-sterile "demo" bioTip are required when the system is initially set up at a user facility. Optional accessories include an armrest and disposable ice packs.

The MD4000-MC Console is a software-driven device which contains circuit boards, a microwave generator, integrated vacuum and cooling systems, and an integrated touch-screen user interface.

The non-invasive miraDry Handpiece is specifically designed to deliver microwave energy to the skin at specified frequency and power levels. The proximal end of the Handpiece has a cable bundle and a console connector that supplies the energy and cooling to the Handpiece. The distal end has a sterile, disposable barrier, the miraDry bioTip, which contacts the patient.

**SUMMARY OF SUBSTANTIAL EQUIVALENCE**

The miraDry MD4000 System described and cleared in 510(k) number K150419 serves as the predicate device for this premarket notification. The miraDry MD4000 System that is the subject of this 510(k) has the same intended use and technological characteristics as the device described and cleared in 510(k) number K150419. Furthermore, there have been no changes in design, material, chemical composition, energy source, or manufacturing process since FDA's clearance of K150419.

**Substantial Equivalence Comparison Table**

| Characteristics | Predicate Device miraDry MD4000 K150419 | Subject Device miraDry MD4000 |
|---|---|---|
| Device Class | II | II |
| Energy Type | Microwave | Microwave |
| Mode of Action | generation of localized heat | generation of localized heat |
| Product Code | NEY, OUB, MWY | NEY, OUB, MWY |
| Indications for Use | The miraDry System MD4000 is indicated for use in the treatment of primary axillary hyperhidrosis plus unwanted underarm hair removal, and permanent reduction of underarm hair of all colors for Fitzpatrick skin types I – IV.

Permanent hair reduction is defined as long-term, stable reduction in the number of hairs regrowing when measured at 6, 9 and 12 months after the completion of a treatment regime. | The miraDry System MD4000 is indicated for use in the treatment of primary axillary hyperhidrosis plus unwanted underarm hair removal, and permanent reduction of underarm hair of all colors for Fitzpatrick skin types I – IV.

Permanent hair reduction is defined as long-term, stable reduction in the number of hairs regrowing when measured at 6, 9 and 12 months after the completion of a treatment regime.

When used for the treatment of primary axillary hyperhidrosis, the miraDry System MD4000 may reduce underarm odor. |
| Function | Heat absorption by tissue located at the dermal-hypodermal interface where the axillary sweat (wetness and odor) glands and hair bulbs reside | Heat absorption by tissue located at the dermal-hypodermal interface where the axillary sweat (wetness and odor) glands and hair bulbs reside |
| Overall System structure | microwave source/amplifier, coolant supply system, operator interface, and microwave, electrical and coolant lines that connect to the applicator | microwave source/amplifier, coolant supply system, operator interface, and microwave, electrical and coolant lines that connect to the applicator |
| Key Components | Console, handpiece, disposable applicator tip | Console, handpiece, disposable applicator tip |
| Console Control Mechanism | Electronic user interface | Electronic user interface |
| Coolant usage | Delivers cooling to the skin surface | Delivers cooling to the skin surface |

NON-CLINICAL TESTING

There was no additional non-clinical testing that was completed, as the device being used is the same as the cleared device (miraDry MD4000 System, cleared under K150419).

CLINICAL TESTING

In support of this 510(k), a prospective, split-patient, randomized, single center trial was conducted. Forty adult subjects with high underarm odor were enrolled. Subjects were treated in one underarm (randomly selected) with the miraDry MD4000 System using the standard miraDry procedure, which at the time of the study was two treatment sessions 3 months apart. The other underarm was untreated and served as the control.

The odor assessments were conducted by four blinded, trained odor assessors, where each assessor gave a score to each underarm between 0 (no malodor) and 10 (extremely strong malodor). Scores for each underarm were obtained by averaging the scores from the four judges. Patients also self-reported their odor scores and rated their satisfaction with the procedure. The mean subject age was 49 years; 63% of the subjects were female and 57% were African American, with the remainder Caucasian.

The study design and results are summarized in the table below.

| Study Design | Prospective, split-patient, randomized, single center trial |
|---|---|
| Sample Size | 40 patients – one underarm treated, one underarm untreated |
| Odor Assessment Method | Panel of 4 blinded, trained odor assessors; each underarm rated on a scale of 0 (none, no malodor) to 10 (extremely strong malodor) and averaged |
| Principal Eligibility Criteria | <ul><li>Score of at least 5 in each underarm; less than a 2 point difference between underarms</li><li>Willing to comply with washout period instructions prior to each odor assessment</li><li>Willing to receive the miraDry treatments and available for the follow-up period</li></ul> |
| Follow-ups | 1 month, 3 months and 6 months after last treatment |
| Endpoints | Primary: Percentage of the subjects that scored at least a 2 point lower odor score in the treated underarm compared to the untreated underarm (responders) when assessed 1 month after treatment<br><br>Secondary:<ul><li>Statistically significant difference in % of subjects with at least a 2 point drop in underarm odor score in the treated underarm compared to the untreated underarm at 3 and 6 months.</li><li>Average difference in odor in the treated underarm compared to the untreated underarm at all follow-up visits.</li><li>Patient-rated satisfaction scores on odor specific questions, as measured at the follow-up visits that are 1, 3 and 6 months post final treatment</li></ul> |

| Effectiveness results | The results for the responder analysis are shown in the table below for the subjects that attended the study visits. |
|---|---|

Table 1: Percentage of subjects with at least 2 point lower odor score in the treated underarm compared to the untreated underarm

| | # of Evaluable subjects | Percentage of subjects with at least 2 point lower odor score in the treated underarm compared to the untreated underarm 1 month after treatment. |
|---|---|---|
| 1 month after treatment | 35 | 23/35   (66%)* |
| 3 months after treatment | 36 | 14/36   (39%) |
| 6 months after treatment | 36 | 13/36   (36%) |

*p=0.09, indicating the proportion of subjects experiencing a 2 point difference (between the treated and untreated underarm) was not significantly greater than 50%.

The primary endpoint and a secondary endpoint were not met, since the percentage of patients with at least a 2 point lower score on the treated underarm compared to the untreated underarm was not statistically significant at the three time points. However, the treated underarm was scored as having lower odor at all time points.

Table 2: Average difference in odor in the treated underarm compared to the untreated underarm at all follow-up visits.

| | Average difference in odor between the treated and untreated underarm (± 95%CI) | P value |
|---|---|---|
| 1 month | 2.84 (±0.73) | <0.0001 |
| 3 months | 1.27 (±0.74) | 0.0005 |
| 6  months | 1.56 (±0.56) | <0.0001 |

The treated underarm was rated by judges as having lower odor scores than the untreated underarm at every time point. Therefore, although the primary endpoint of statistically significant responder rate of 2 point reduction in odor was not met, the study data demonstrate some reduction of underarm odor when used for the treatment of primary axillary hyperhidrosis.

| | Finally, subjects were asked about their general satisfaction and if they would be willing to receive treatment for free on the untreated arm. In response to the general satisfaction question, 29/35 or 83% reported being at least somewhat satisfied. However, only 15/36 or 42% responded that they would like undergo treatment of the untreated underarm at no cost. |
|---|---|
| Safety results | About half the treated subjects reported expected post-treatment effects such as localized edema and discomfort (Grade 0 events). One patient reported a mild infection that cleared in 10 days; another patient reported pain likely due to an infection after the optional biopsy; this cleared in 12 days. |
| Histo-pathology results | An optional component of the study was to obtain small biopsies from each of the treated and untreated (control) underarms after the final follow-up visit (6 months post-treatment). A blinded histopathologist review of the available pairs with adequate samples found: <br><br> (1) In 7/10 cases the control sample had more apocrine glands <br><br> (2) In 8/10 cases the treated sample had a higher degree of fibrosis. |

**CONCLUSION**

The changes in Indications for Use do not pose any new questions of safety or efficacy. As demonstrated through clinical testing, the subject device miraDry MD4000 System's safety and effectiveness are substantially equivalent to those of the legally marketed predicate device (K150419).



March 15, 2018

Miramar Labs, Inc.
Cynthia Kada
Sr. Director, QA
2790 Walsh Avenue
Santa Clara, California 95051

Re: K180396
    Trade/Device Name: miraDry System
    Regulation Number: 21 CFR 878.4400
    Regulation Name: Electrosurgical Cutting And Coagulation Device And Accessories
    Regulatory Class: Class II
    Product Code: NEY, OUB, MWY
    Dated: February 12, 2018
    Received: February 13, 2018

Dear Cynthia Kada:

We have reviewed your Section 510(k) premarket notification of intent to market the device referenced
above and have determined the device is substantially equivalent (for the indications for use stated in the
enclosure) to legally marketed predicate devices marketed in interstate commerce prior to May 28, 1976, the
enactment date of the Medical Device Amendments, or to devices that have been reclassified in accordance
with the provisions of the Federal Food, Drug, and Cosmetic Act (Act) that do not require approval of a
premarket approval application (PMA). You may, therefore, market the device, subject to the general
controls provisions of the Act. The general controls provisions of the Act include requirements for annual
registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding
and adulteration. Please note: CDRH does not evaluate information related to contract liability warranties.
We remind you, however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it may be
subject to additional controls. Existing major regulations affecting your device can be found in the Code of
Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may publish further announcements
concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA
has made a determination that your device complies with other requirements of the Act or any Federal
statutes and regulations administered by other Federal agencies. You must comply with all the Act's
requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part
801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803); good
manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820);

and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

For comprehensive regulatory information about medical devices and radiation-emitting products, including information about labeling regulations, please see Device Advice (https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/) and CDRH Learn (http://www.fda.gov/Training/CDRHLearn). Additionally, you may contact the Division of Industry and Consumer Education (DICE) to ask a question about a specific regulatory topic. See the DICE website (http://www.fda.gov/DICE) for more information or contact DICE by email (DICE@fda.hhs.gov) or phone (1-800-638-2041 or 301-796-7100).

Sincerely,

Jennifer R. Stevenson -S3

For Binita S. Ashar, M.D., M.B.A., F.A.C.S.
    Director
    Division of Surgical Devices
    Office of Device Evaluation
    Center for Devices and Radiological Health

Enclosure

| DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>Food and Drug Administration<br>**Indications for Use** | Form Approved: OMB No. 0910-0120<br>Expiration Date: 06/30/2020<br>*See PRA Statement below.* |
|---|---|

510(k) Number *(if known)*
K180396

Device Name
miraDry System MD4000

Indications for Use *(Describe)*
The miraDry System MD4000 is indicated for use in the treatment of primary axillary hyperhidrosis plus unwanted underarm hair removal, and permanent reduction of underarm hair of all colors for Fitzpatrick skin types I – IV. Permanent hair reduction is defined as long-term, stable reduction in the number of hairs regrowing when measured at 6, 9 and 12 months after the completion of a treatment regime.
When used with the treatment of primary axillary hyperhidrosis, the miraDry System may reduce underarm odor.

Type of Use *(Select one or both, as applicable)*

☒ Prescription Use (Part 21 CFR 801 Subpart D)      ☐ Over-The-Counter Use (21 CFR 801 Subpart C)

**CONTINUE ON A SEPARATE PAGE IF NEEDED.**

This section applies only to requirements of the Paperwork Reduction Act of 1995.

**\*DO NOT SEND YOUR COMPLETED FORM TO THE PRA STAFF EMAIL ADDRESS BELOW.\***

The burden time for this collection of information is estimated to average 79 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden, to:

> Department of Health and Human Services
> Food and Drug Administration
> Office of Chief Information Officer
> Paperwork Reduction Act (PRA) Staff
> *PRAStaff@fda.hhs.gov*

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

## 2. 510(k) SUMMARY

| | |
|---|---|
| **Classification:** | Class II (special controls) |
| **Classification No.:** | 21 CFR 878.4400 |
| **Classification Name:** | Electrosurgical cutting and coagulation device and accessories. |
| **Product Code(s):** | OUB, NEY, MWY |
| **Common Name:** | Instrument for Treatment of Hyperhidrosis System, Ablation, Microwave And Accessories System, Microwave, Hair Removal |
| **Trade Name** | miraDry MD4000 System |
| **Predicate Device** | miraDry MD 4000 System K160141 |
| **Submitter:** | Miramar Labs, Inc. |
| | 2790 Walsh Avenue |
| | Santa Clara, CA 95051, USA |
| | Tel:   408-940-8700 |
| | Fax:  408-940-8795 |
| **FDA Registration No.** | 3008082710 |
| **Contact:** | Cynthia  Kada |
| **Date:** | February 12, 2018 |

PURPOSE OF SUBMISSION

The purpose of this Special 510(k) submission is to modify how the treatment bioTip component of the miraDry System is provided to the User. The intended use of the modified device, as described in the labeling, has not changed as a result of this modification.

DEVICE DESCRIPTION

The miraDry MD4000 System is a microwave device designed to heat tissue located at the dermal- hypodermal interface where the axillary sweat and odor glands and hair bulbs reside using a surface contact applicator.  The miraDry MD4000 System consists of:

o  MD4000-MC Console;
o  MD4000-HP miraDry Handpiece; and
o  MD4000-BT miraDry bioTip that snaps onto the Handpiece

The miraDry MD4000 System also includes the following Class I components/accessories:

o  MD4000-TS template system, a required component for the miraDry treatment
o  MD4000-PK priming kit; and
o  MD4000-BT-DE demonstration bioTip.

The MD4000-PK priming kit and the non-sterile "demo" bioTip are required when the system is initially set up at a user facility. Optional accessories include an armrest and disposable ice packs.

The MD4000-MC Console is a software-driven device, which contains circuit boards, a microwave generator, integrated vacuum and cooling systems, and an integrated touch-screen user interface.

The non-invasive miraDry Handpiece is specifically designed to deliver microwave energy to the skin at specified frequency and power levels.  The proximal end of the Handpiece has a cable bundle and a console connector that supplies the energy and cooling to the Handpiece.  The distal end of the Handpiece has a single patient use disposable, the miraDry bioTip, which contacts the underarm skin of the patient.

DEVICE MODIFICATION

As described in K160141, the bioTip is disposable and for single patient use, and is provided sterile. The only change to the miraDry MD4000 system cleared under K160141 that is the subject of this Special 510(k) involves supplying the disposable bioTips to the user as clean and non-sterile for single patient use only. The intended use of the modified device, as described in the labeling, has not changed as a result of this modification.

INDICATIONS FOR USE

The miraDry System MD4000 is indicated for use in the treatment of primary axillary hyperhidrosis plus unwanted underarm hair removal, and permanent reduction of underarm hair of all colors for Fitzpatrick skin types I – IV.

Permanent hair reduction is defined as long-term, stable reduction in the number of hairs regrowing when measured at 6, 9 and 12 months after the completion of a treatment regime.

When used with the treatment of primary axillary hyperhidrosis, the miraDry System may reduce underarm odor.

SUMMARY OF SUBSTANTIAL EQUIVALENCE

The miraDry MD4000 System described and cleared in 510(k) number K160141 serves as the predicate device for this premarket notification. The miraDry MD4000 System that is the subject of this Special 510(k) has the same technological characteristics and intended use as the device described and cleared in 510(k) number K160141. Furthermore, there have been no changes in design, component materials, chemical composition, or energy source, since FDA's clearance of K160141.

Therefore, the miraDry System MD4000 remains substantially equivalent to the predicate device currently marketed under the Federal Food, Drug and Cosmetic Act except for one characteristic: the condition of use of the bioTips. This difference is rendered inconsequential by the "single patient use" and disposable nature of the bioTips that eliminates the risk of cross contamination between patients. Summarized in the substantial equivalence tables below are the key technological characteristics and indications for use of the miraDry System compared to the predicate device identified in this Special 510(k).

**miraDry System Substantial Equivalence Comparison Table**

| Characteristics miraDry System | Predicate Device miraDry MD4000 K160141 | Modified Device miraDry MD4000 | Comparison |
|---|---|---|---|
| **Device Class** | II | II | Same |
| **Energy Type** | Microwave | Microwave | Same |
| **Mode of Action** | Generation of localized heat | Generation of localized heat | Same |
| **Product Code** | NEY, OUB, MWY | NEY, OUB, MWY | Same |

| Characteristics miraDry System | Predicate Device miraDry MD4000 K160141 | Modified Device miraDry MD4000 | Comparison |
|---|---|---|---|
| Indications for Use | The miraDry System MD4000 is indicated for use in the treatment of primary axillary hyperhidrosis plus unwanted underarm hair removal, and permanent reduction of underarm hair of all colors for Fitzpatrick skin types I – IV.<br><br>Permanent hair reduction is defined as long-term, stable reduction in the number of hairs regrowing when measured at 6, 9 and 12 months after the completion of a treatment regime.<br><br>When used with the treatment of primary axillary hyperhidrosis, the miraDry System may reduce underarm odor. | The miraDry System MD4000 is indicated for use in the treatment of primary axillary hyperhidrosis plus unwanted underarm hair removal, and permanent reduction of underarm hair of all colors for Fitzpatrick skin types I – IV.<br><br>Permanent hair reduction is defined as long-term, stable reduction in the number of hairs regrowing when measured at 6, 9 and 12 months after the completion of a treatment regime.<br><br>When used with the treatment of primary axillary hyperhidrosis, the miraDry System may reduce underarm odor. | Same |
| Function | Heat absorption by tissue located at the dermal-hypodermal interface where the axillary sweat (wetness and odor) glands and hair bulbs reside | Heat absorption by tissue located at the dermal-hypodermal interface where the axillary sweat (wetness and odor) glands and hair bulbs reside | Same |
| Overall System structure | Microwave source/amplifier, coolant supply system, operator interface, and microwave, electrical and coolant lines that connect to the applicator | Microwave source/amplifier, coolant supply system, operator interface, and microwave, electrical and coolant lines that connect to the applicator | Same |
| Key Components | Console, Handpiece, disposable bioTip | Console, Handpiece, disposable bioTip | Same |
| Console Control Mechanism | Electronic user interface | Electronic user interface | Same |
| Coolant usage | Delivers cooling to the skin surface | Delivers cooling to the skin surface | Same |

**miraDry System bioTip Component Substantial Equivalence Comparison Table**

| Characteristics of bioTip | Predicate Device miraDry MD4000 K160141 | Modified Device miraDry MD4000 | Comparison |
|---|---|---|---|
| Materials | Polyurethane, Thermoplastic Elastomer (TPE), Polycarbonate | Polyurethane, Thermoplastic Elastomer (TPE), Polycarbonate | Same |
| Biocompatible | Yes | Yes | Same |
| Packaging Configuration | Thermo-formed (PETG) plastic tray with Tyvek lid | Thermo-formed (PETG) plastic tray with Tyvek lid | Same |
| Treatment Condition | Sterile | Clean, non-sterile | Change to how it is provided |
| Condition of Use | Single patient use, disposable | Single patient use, disposable | Same |

SUMMARY OF VERIFICATION AND VALIDATION ACTIVITIES

The Special 510(k) for this device modification to the cleared miraDry System (K160141) utilized Miramar Labs established quality system and design control requirements in accordance with the Quality System Regulation (21 CFR 820).

Miramar Labs Inc. declares conformance to design controls in making this change and utilized the following risk based assessments:

1. Risk assessment including Hazard Analysis
2. Complaints incidence and review
3. Manufacturing environment and process evaluation including bioburden testing and monitoring trends
4. Instructions for Use
5. User interface and clinician user feedback

Risk control measures were focused on manufacturing environment, user interface evaluation, and postmarket surveillance and user feedback. No new risks were identified as a result of this change.

CONCLUSION

Based on all information in this Special 510(k), the miraDry MD4000 System and accessories is substantially equivalent to the identified predicate device currently marketed under the Federal Food, Drug and Cosmetic Act. The safety and effectiveness of the device modification are reasonably assured with no new or increased risks justifying 510(k) clearance.

# EXHIBIT B

Maximize Patient Volume with the

NEW Optimized Treatment Protocol

July 22, 2015

# The Opportunity : Sweat

## *Temporary Solutions*

- OTC Anti-perspirants
- Rx Anti-perspirants (Drysol®)
- Systemic Drugs (anticholinergics)
- Botox®
  - 20-30 injections / axilla
  - $1k-$2k / treatment
  - Only treats Sweat, NOT odor

## *Permanent, But Invasive and Costly*

- Surgery
  - Endoscopic thoracic sympathectomy
  - Surgical excision
  - Liposuction

**Large Unmet Need**

**Permanent, Non-Invasive Solution**



# NOW: A New Aesthetic Category

People don't think of a **NEED** until you provide them a **SOLUTION**.



Many people don't recognize sweating as permanently treatable because they do not know there is a SOLUTION: **miraDry.**





# Prevalence of Severe Primary Axillary Hyperhidrosis (SPAHH)

- Primary axillary hyperhidrosis affects approximately 3% of the US population

- An estimated **1.3 million Americans** suffer from severe primary axillary hyperhidrosis

- Approximately 62% of sufferers have never discussed it with a healthcare professional

- **Ages 18 to 54**—the prime working years—are the period of highest incidence



MK0427.A

1. Strutton et al. *J Am Acad Dermatol.* 2004. 11

# *NOW*: Phase 2

- Life-style change
  - miraDry is for ANYONE bothered by their sweat

- Position treatment to this market
  - Proven efficacy
  - Quick treatment times
  - Favorable pricing
  - Little to no downtime


miraDry
The sweat stops here.™

MK0427.A

12

